**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Essma Bengabsia,<br>Plaintiff.<br><br>~vs~<br><br>BlackRock Inc,<br>Alexander Alli,<br>John And Jane Does 1-10, and<br>ABC Corps. 1-10<br>Defendants. | Index Number: 25-cv-549<br>**Civil Action**<br>**First Amended Complaint**<br>**Request For a Jury Trial** |

Plaintiff Essma Bengabsia, by and through her attorneys, T. A. Blackburn Law, PLLC, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief as to all other matters.

1. This is a civil rights action for damages arising from sexual assault, sexual harassment, gender-based violence, racial and religious discrimination, and intentional retaliation that Plaintiff Essma Bengabsia suffered during her employment at BlackRock, Inc. from August 2018 through June 2019.
2. On October 2, 2018, while Plaintiff sat working at her desk on BlackRock's 7th floor trading floor at 55 East 52nd Street, New York, Defendant Alexander Alli sexually assaulted Plaintiff by forcefully and repeatedly thrusting his genitals and pelvic region into the back of Plaintiff's chair in a humping motion. The force was so aggressive that it propelled Plaintiff forward and nearly knocked her over her computer and desk.
3. On October 11, 2018—nine days later—Defendant Alli publicly threatened to sexually touch Plaintiff again, standing directly behind her while asking approximately ten colleagues: "Should I touch her? Should I do it? Does it count as sexual harassment if I touch her?" Multiple colleagues encouraged him, and a female colleague explicitly stated "It doesn't count as sexual harassment if you touch her."
4. These incidents were not isolated. Between September 2018 and February 2019, Defendant Alli engaged in an escalating pattern of sexual harassment and assault against Plaintiff, while multiple colleagues subjected her to racist, Islamophobic, and religiously discriminatory conduct.

5. When Plaintiff finally reported the harassment and assault to BlackRock's Human Resources in February 2019—after being warned by senior mentors that doing so would trigger retaliation—she provided detailed documentation including exact dates, times, locations, names of approximately ten witnesses, and notice that security cameras had recorded Defendant Alli's conduct.
6. BlackRock responded with a sham investigation. On May 9, 2019, BlackRock informed Plaintiff that it "could not find evidence to corroborate her claims" despite the overwhelming documentation and available eyewitnesses. BlackRock took no disciplinary action against Defendant Alli.
7. Instead, BlackRock retaliated against Plaintiff by:
    a. Making false accusations about her conduct
    b. Offering to transfer only her (the victim), not Defendant Alli (the perpetrator)
    c. Giving her a discriminatory low performance rating (2.0 vs 3.0 for comparable male colleagues).
8. Shortly after Plaintiff's forced resignation in June 2019, BlackRock promoted Defendant Alli from Vice President to Director, thereby rewarding his sexual violence and ratifying his conduct.
9. Upon information and belief, in November 2023, BlackRock commissioned an investigation by the law firm Paul, Weiss, and CEO Larry Fink issued a memorandum acknowledging that employees had complained about harassment and discrimination, and that "the reporting employees were dissatisfied with the way their concerns were addressed at the time"—a direct reference to Plaintiff's experience.
10. Plaintiff brings this action for damages pursuant to the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq., the New York City Human Rights Law, N.Y.C. Admin. Code §§ 10-1101 et seq., the Victims of Gender-Motivated Violence Protection Law (lookback statute), N.Y.C. Admin. Code §§ 10-1105 et seq., the Adult Survivors Act (lookback statute), N.Y. C.P.L.R. § 214-j, and New York common law tort principles.

## THE PARTIES

### A. Plaintiff

11. Essma Bengabsia is a female individual currently residing in Hudson County, New Jersey. She is a Muslim woman of North African (Tunisian) descent who wears hijab (Islamic head covering) in accordance with her religious beliefs and practices.

12. At the time of the conduct alleged herein, Plaintiff was employed by Defendant BlackRock, Inc. as a full-time analyst in the Credit Product Strategy group, working on the 7th floor trading floor at BlackRock's New York headquarters located at 55 East 52nd Street, New York, New York 10022.
13. Plaintiff was approximately 23 years old at the time of the conduct, newly graduated from college and in her first full-time position after completing BlackRock's diversity cohort internship program.

B. **Defendant BlackRock, Inc.**

14. BlackRock, Inc. is a Delaware corporation with its principal place of business currently located at 50 Hudson Yards, New York, New York 10001. At the time of the conduct alleged herein (2018-2019), BlackRock's principal place of business was located at 55 East 52nd Street, New York, New York 10022.
15. BlackRock is one of the world's largest asset management firms, with over 20,000 employees worldwide and approximately $13 trillion in assets under management.
16. At all relevant times, BlackRock employed more than four employees and engaged in an industry affecting interstate commerce, satisfying all jurisdictional prerequisites for liability under applicable state employment discrimination laws.
17. BlackRock exercised control over Plaintiff's terms and conditions of employment, including hiring, compensation, work assignments, supervision, discipline, and termination decisions.
18. BlackRock maintained a trading floor workplace environment that Plaintiff and other employees occupied daily, with control over workplace policies, procedures, and investigations into complaints.

C. **Defendant Alexander Alli**

19. Alexander Alli is an individual currently residing at 270 West 17th Street, Apartment 11B, New York, New York 10011.
20. At all relevant times from August 2018 through at least mid-2019, Defendant Alli was employed by BlackRock as a Vice President in the Credit Product Strategy group, working on the 7th floor trading floor at BlackRock's New York headquarters.

21. Defendant Alli worked in close physical proximity to Plaintiff on the trading floor and worked on similar leveraged finance products, including high yield bonds and collateralized loan obligations ("CLOs").

22. Defendant Alli held supervisory authority over junior analysts and had the power to influence their work assignments, evaluations, and career advancement. He was significantly older than Plaintiff—approximately 20 years her senior.

23. Upon information and belief, in or around July or August 2019—shortly after Plaintiff's June 2019 forced resignation—BlackRock promoted Defendant Alli from Vice President to Director, thereby rewarding his sexual harassment and assault of Plaintiff and signaling that such conduct would be tolerated and protected.

24. Upon information and belief, Defendant Alli continues to be employed by BlackRock as of the filing of this Amended Complaint, holding the position of Director or higher.

D. **John and Jane Doe Defendants**

25. Defendants John and Jane Does 1-10 are currently unknown individuals who, at all relevant times, were employees, agents, supervisors, managers, or representatives of BlackRock and who:

    a. Witnessed Defendant Alli's sexual harassment and assault of Plaintiff.
    b. Encouraged and facilitated Defendant Alli's harassment and assault.
    c. Participated in creating and maintaining a hostile work environment.
    d. Had knowledge of the harassment and discrimination but failed to take corrective action.
    e. Made decisions regarding BlackRock's investigation and response to Plaintiff's complaints.
    f. Aided, abetted, incited, compelled, or coerced the unlawful discriminatory and harassing practices alleged herein.

26. These individuals include, without limitation:

    a. Sara Golshahr (analyst or associate who explicitly stated "It doesn't count as sexual harassment if you touch her" and made racist statements about the Middle East).
    b. Mitchell Garfin (Managing Director who mocked Plaintiff's Islamic greeting and mocking her Arabic pronunciation; encouraged Defendant Alli's harassment; encouraged circling of desk on February 6, 2019).
    Roberto Langstroth (analyst or associate who told Plaintiff "I hope you fail" and mocked her religious observance; participated in hostile environment).
    c. Peter Hirsh (senior investor who made racist and Islamophobic statements calling Middle Easterners "Bedouins and desert dwellers"; mocked Plaintiff at holiday party, publicly rebuked her in front of all her colleagues on the trading

floor and called her "the grinch" for not participating in Christmas holiday activities as a Muslim).

d. Upon information and belief: Alex Reynolds (Employee Relations VP who conducted sham investigation).

e. Upon information and belief: Jennifer Snape (HR Vice President who participated in sham investigation).

f. Upon information and belief: Khusbhat Chaudhry (HR Vice President who admitted in text communications that BlackRock would "make" a performance case to retaliate against harassment complainants; participated in or had knowledge of the retaliation scheme and failed to prevent it).

g. Upon information and belief: Jonathan McBride (Managing Director, Chief Diversity Officer at the time, who failed to advocate for Plaintiff despite her pleas for help).

h. Upon information and belief: Hilary Thorndike (Vice President, Plaintiff's direct supervisor).

i. Upon information and belief: Maybel Marte (Managing Director, head of Plaintiff's team, who told Plaintiff she may not be "cut out" for financial services if she would not tolerate sexual harassment; normalized harassment as industry standard; and who also told plaintiff that as an entry-level analyst, she is "bottom of the food chain" and she is "easily replaceable," and that if she vocalizes her concerns, she can be kicked out of BlackRock and easily replaced by other entry-level employees. Marte also told plaintiff that BlackRock is a large and well-connected organization, so if Plaintiff attempts to speak out about her experiences, BlackRock will find her and can ruin her career wherever she goes, so that it would best suit her to stay silent so that BlackRock does not destroy her career prospects in finance permanently).

27. Upon information and belief: Amer Bisat, Gargi Chaudhuri, Matthew Breitfelder, and James Keenan (Managing Directors in HR/senior leadership of the firm who were approached by Plaintiff for help and took no action). Plaintiff reserves the right to amend this Complaint to add these individuals by name upon further discovery.

**JURISDICTION AND VENUE**

A. Subject Matter Jurisdiction - Diversity Jurisdiction

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), which grants federal district courts original jurisdiction over civil actions where there is complete diversity of citizenship among all plaintiffs and all defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. Both requirements are satisfied here.

B. Citizenship of Parties

1. Plaintiff's Citizenship

29. Plaintiff Essma Bengabsia is a citizen of the State of Maryland. Plaintiff is currently domiciled in Maryland, where she resides with her family. Plaintiff established her Maryland domicile and maintains her principal residence in Maryland. Plaintiff has demonstrated clear intent to remain domiciled in Maryland through her registration to vote in Maryland, establishment of banking relationships in Maryland, obtaining a Maryland driver's license, and maintaining ongoing family, social, and business connections in Maryland. Plaintiff's domicile in Maryland is her permanent home where she intends to remain indefinitely.

2. Defendant BlackRock, Inc.'s Citizenship

30. Defendant BlackRock, Inc. ("BlackRock") is a corporation organized and incorporated under the laws of the State of Delaware. For purposes of determining diversity jurisdiction under 28 U.S.C. § 1332(c), BlackRock is a citizen of two states:

    a. State of Incorporation: BlackRock is a citizen of Delaware, as it is incorporated in Delaware;
    b. Principal Place of Business: BlackRock is a citizen of New York, as its principal place of business is located in New York.

31. BlackRock's Principal Place of Business—New York. BlackRock maintains its principal place of business in the State of New York. Specifically, at the time of the conduct alleged in this Complaint (2018-2019), BlackRock's principal place of business was located at 55 East 52nd Street, New York, New York 10022. BlackRock's principal place of business is currently located at 50 Hudson Yards, New York, New York 10001.

32. Application of "Nerve Center" Test. The "principal place of business" of a corporation for diversity jurisdiction purposes is determined under the "nerve center" test established in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). Under this test, the principal place of business is the place where a corporation's officers direct, control, and coordinate the corporation's activities. BlackRock's nerve center is located in New York. BlackRock's executive leadership, including its Chief Executive Officer, Chief Financial Officer, Chief Risk Officer, and senior management team, are headquartered at BlackRock's offices in New York. From these New York offices, senior leadership directs, controls, and coordinates BlackRock's global operations, including decisions regarding hiring, compensation, employment practices, investigations of employee complaints, and all aspects of employee management and discipline. BlackRock's New York offices are not merely administrative;

they are the site of substantial and ongoing business operations, including a major trading floor where Plaintiff worked. BlackRock's New York facility generates substantial revenues and is integral to BlackRock's global asset management business.

3. Defendant Alexander Alli's Citizenship

33. Defendant Alexander Alli is a citizen of the State of New York. Defendant Alli is a natural person who is domiciled in and a citizen of the State of New York. Defendant Alli resides at 270 West 17th Street, Apartment 11B, New York, New York 10011.

C. Complete Diversity

34. Complete diversity exists in this action. Federal jurisdiction exists under 28 U.S.C. § 1332(a) only if there is complete diversity of citizenship, meaning that each plaintiff must be a citizen of a different state from each defendant. Complete diversity is "complete" when no defendant is a citizen of the same state as any plaintiff. In this action:

a. Plaintiff: Maryland citizen.
b. Defendant BlackRock, Inc.: Delaware and New York citizen (neither Maryland).
c. Defendant Alexander Alli: New York citizen (not Maryland).
d. John and Jane Doe Defendants: Upon information and belief, all Doe Defendants are citizens of states other than Maryland.

35. No plaintiff in this action shares state citizenship with any defendant. Complete diversity is satisfied.

D. Amount in Controversy

36. Amount in Controversy Exceeds $75,000. The amount in controversy in this action substantially exceeds $75,000, exclusive of interest and costs. Plaintiff seeks the following damages:

a. Compensatory Damages:
   i. Lost Wages (Past and Future): $1,500,000+.
   ii. Lost Career Advancement Opportunities: $5,000,000+.
   iii. Medical and Psychological Treatment: $2,000,000+.
   iv. Pain and Suffering: $500,000+.
   v. Dignitary Harm and Loss of Identity: $100,000+.
   vi. Total Compensatory Damages: $9,250,000+.
b. Punitive Damages:
   i. Punitive Damages Against BlackRock: $5,000,000-$10,000,000.
   ii. Punitive Damages Against Individual Defendants: $1,000,000-$5,000,000.
   iii. Total Punitive Damages: $6,000,000-$15,000,000
c. Estimated Total Amount in Controversy: $13,000,000+

37. This far exceeds the $75,000 threshold.

E. Venue

38. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b). Defendant BlackRock, Inc., a major defendant in this action, is resident in the Southern District of New York because its principal place of business is located in New York County at 55 East 52nd Street (at the time of the conduct) and currently at 50 Hudson Yards, New York, New York 10001. Defendant Alexander Alli is an individual resident of the Southern District of New York because he is domiciled in New York County at 270 West 17th Street, Apartment 11B, New York, New York 10011.

39. A substantial part of the events and omissions giving rise to Plaintiff's claims occurred in the Southern District of New York, specifically in New York County:

    a. Location of Sexual Assault and Harassment: All incidents of sexual assault, sexual harassment, and gender-based violence by Defendant Alli occurred at BlackRock's 7th floor trading floor located at 55 East 52nd Street, New York, New York 10022, including October 2, 2018 (forced sexual assault); October 11, 2018 (public threat of sexual touching); October 18, 2018 (continued harassment discussion); and February 6, 2019 (stalking and intimidation).
    b. Location of Racial/Religious Discrimination: All incidents of racist, Islamophobic, and religiously discriminatory conduct occurred at BlackRock's trading floor in New York County.
    c. Location of Investigation and Retaliation: BlackRock's investigation and retaliation occurred at BlackRock's offices in New York County, including the May 9, 2019 call in which Reynolds informed Plaintiff of investigation results and made concerning statements.

F. Timeliness Under Lookback Statutes

40. This action is timely filed pursuant to N.Y. C.P.L.R. § 214-j, the Adult Survivors Act (ASA). The ASA permits civil claims arising from sexual offenses to be brought at any time if the offense occurred when the plaintiff was 18 years or older. Plaintiff was 23 years old at the time of the October 2, 2018, sexual assault, clearly meeting the requirement. The events giving rise to Plaintiff's claims occurred in 2018-2019. This Amended Complaint was filed in November 2025. While this would be time-barred under traditional statute of limitations rules, it is timely under the ASA lookback provision.

41. This action is also timely filed pursuant to N.Y.C. Admin. Code § 10-1105, the Victims of Gender-Motivated Violence Protection Law (VGMVPL). The VGMVPL permits civil actions for crimes of violence motivated by gender regardless of when the crime was discovered or reported, provided the crime occurred when the plaintiff was 18 years or

older. Defendant Alli's sexual assault and harassment of Plaintiff were motivated by Plaintiff's gender and constitute gender-motivated violence. Plaintiff was 23 years old at the time, clearly meeting the requirement.

///

## FACTUAL ALLEGATIONS

A. **Plaintiff's Employment at BlackRock**

**Recruitment and Hiring**

42. In summer 2017, Plaintiff participated in BlackRock's diversity cohort summer internship program as an undergraduate student.
43. Plaintiff successfully completed the internship and received strong performance evaluations.
44. In or around September 2017, BlackRock extended a full-time offer of employment to Plaintiff as an analyst in the Credit Product Strategy group.
45. On or about May 23, 2018, Plaintiff began her full-time employment at BlackRock.

**Work Environment and Job Responsibilities**

46. Plaintiff worked on the 7th floor open trading floor at BlackRock's headquarters located at 55 East 52nd Street, New York, New York 10022.
47. An "open trading floor" is a large, open office space without private offices or cubicles, where dozens of employees sit at desks arranged in rows with minimal physical barriers. Conduct at one desk is generally visible and audible to numerous other employees in the vicinity.
48. Plaintiff's assigned duties included analyzing collateralized loan obligations ("CLOs"), leveraged loans, high yield bonds, and other leveraged finance products.
49. Plaintiff reported directly to Hilary Thorndike (Vice President) and worked on a team led by Maybel Marte (Managing Director).
50. Defendant Alli's desk was located in close physical proximity to Plaintiff's desk—approximately 5-7 feet away—such that Defendant Alli could easily walk to Plaintiff's desk and interact with her throughout the workday.
51. Plaintiff was one of the first, if not the first, hijab-wearing Muslim women to work on a trading floor at BlackRock's New York headquarters, making her conspicuous in a predominantly white, male, and non-Muslim workplace.

B. **Pervasive Racism, Islamophobia, and Religious Discrimination (August-December 2018)**

52. From Plaintiff's first month on the trading floor in August 2018, Plaintiff was subjected to a hostile, abusive work environment characterized by pervasive racist, Islamophobic, and religiously discriminatory conduct by multiple colleagues.

**Incident 1: August 2018 - Mocking of Islamic Greeting**

53. In or around mid-to-late August 2018, Plaintiff received a phone call from her parents while sitting at her desk.
54. Plaintiff answered and greeted her parents in Arabic by saying "As-salamu alaykum," the traditional Islamic greeting meaning "peace be upon you."
55. Mitchell Garfin, a Managing Director seated within earshot of Plaintiff's desk, overheard this greeting.
56. After Plaintiff ended the call, Garfin loudly and repeatedly mimicked how Plaintiff pronounced "As-salamu alaykum," mocking the Arabic pronunciation and intonation in front of other colleagues seated nearby.

 Other colleagues heard Garfin's mimicry and laughed, further humiliating Plaintiff.

57. Plaintiff felt singled out because of her religion and ethnicity.

**Incident 2: August/September 2018 - "They Stone People in the Middle East"**

58. In or around late August or early September 2018, Plaintiff was sitting at her desk when she overheard a loud conversation taking place nearby.
59. Sara Golshahr, an analyst or associate seated near Plaintiff, was speaking to other colleagues within Plaintiff's hearing.
60. Golshahr stated loudly enough for Plaintiff and others to hear: "They stone people in the Middle East" and "There are no governments there."
61. Golshahr made these statements knowing that Plaintiff is of North African descent (Tunisian heritage) and that Plaintiff could hear her.
62. Golshahr's statements were based on ignorant stereotypes about Middle Eastern and North African people and were intended to demean and marginalize Plaintiff because of her ethnicity and national origin.
63. Plaintiff felt deeply offended and unsafe, as the statement that "they stone people" was particularly disturbing given that Plaintiff is a visible Muslim woman.

**Incident 3: September 2018 - "Bedouins and Desert Dwellers"**

64. In or around mid-September 2018, during a team discussion about potential business travel to the Middle East, Peter Hirsh, a senior investor, made derogatory comments about Middle Eastern people.
65. Hirsh stated, in Plaintiff's presence and within her hearing, that Middle Easterners are "overly strict Bedouins and desert dwellers."
66. Hirsh then turned to Plaintiff and asked her, in a mocking tone: "What do they do for fun? Party in the deserts?"
67. When Plaintiff objected to Hirsh's stereotyping and explained that his characterizations were inaccurate and offensive, Hirsh dismissed her objection by responding: "I don't care what you say; it's true."
68. Hirsh's comments were based on racist and xenophobic stereotypes about Middle Eastern, Arab, and North African people.
69. The comments were made in front of multiple colleagues, further humiliating Plaintiff and signaling to other employees that it was acceptable to demean and marginalize Plaintiff based on her ethnicity and perceived national origin.

**Incident 4: September 2018 - "You Could Not Possibly Be American"**

70. In or around September 2018, Plaintiff she met a Managing Director who worked in BlackRock's Human Resources department and helped lead the company's diversity and inclusion efforts.
71. Upon learning Plaintiff's name—Essma Bengabsia—the HR Managing Director insisted that Plaintiff's name "was not American" and stated that Plaintiff "could not possibly be American."
72. Plaintiff explained to the HR Managing Director that she was born in Brooklyn, New York, raised in New Jersey, and has lived in the United States her entire life.
73. The HR Managing Director dismissed or minimized Plaintiff's explanation and continued to express skepticism that Plaintiff was American, based solely on Plaintiff's name and appearance.
74. This incident was particularly egregious because it came from a senior HR official responsible for diversity and inclusion, sending a message that even BlackRock's purported champions of diversity viewed Plaintiff as a foreign "other" who did not belong.

**Incident 5: September-November 2018 - "I Hope You Fail" and Discrimination Regarding Prayer**

75. Throughout fall 2018 (approximately September through November), Plaintiff was subjected to ongoing harassment and discrimination by Roberto Langstroth, a colleague assigned to train Plaintiff on certain work tasks.
76. Langstroth repeatedly came to Plaintiff's desk to tell her he "hoped to see [her] fail" in her work tasks and her role at BlackRock.
77. Langstroth often greeted Plaintiff with hostile statements such as "You're such a mess" and "I hope you fail." Langstroth made these comments publicly in the open trading floor. Colleagues, including team leaders, watched as he regularly made these statements to Plaintiff without making any intervention to stop his behavior.
78. Additionally, Plaintiff takes breaks during the workday to pray in BlackRock's designated prayer room, as Islam requires five daily prayers at specific times. Breaks are typically a few minutes long.
79. Langstroth publicly rebuked Plaintiff for being away from her desk after her prayer breaks.
80. Langstroth told Plaintiff that she "did not work hard enough," implying that Plaintiff's religious observance of prayer made her less dedicated or productive than other employees—even though Plaintiff informed Langstroth that her absences were for mandatory religious prayer.
81. Langstroth's conduct was discriminatory based on Plaintiff's religion and created a hostile environment by singling her out for practicing her faith.

**Incident 6: December 2018 Holiday Party - "Why Don't You Just Be American for Once?"**

82. In or around mid-December 2018, BlackRock's Credit Group held its annual holiday party to celebrate the Christmas season.
83. Many of Plaintiff's colleagues wore Christmas-themed sweaters and other festive attire to the party.
84. Plaintiff, who is Muslim and does not celebrate Christmas, wore her usual professional work attire and hijab to the party.
85. Peter Hirsh approached Plaintiff during the party and berated her in front of numerous colleagues for not participating in the Christmas celebration and for not wearing Christmas-themed attire.

86. After Plaintiff explained to Hirsh that she is Muslim and that Christmas is not a holiday celebrated in Islam, Hirsh yelled at Plaintiff: "Why don't you just be American for once?"

87. Hirsh then mockingly called Plaintiff "the Grinch" (a fictional character known for hating Christmas) and promised to buy Plaintiff a "Grinch sweater" to wear at the following year's holiday party.

88. Hirsh's comments equated being "American" with being Christian and celebrating Christmas, thereby denigrating Plaintiff's Muslim identity as somehow un-American and foreign.

89. This incident occurred in front of multiple colleagues, further humiliating Plaintiff and reinforcing the message that she did not belong at BlackRock because of her religion.

90. Later on, the head of Plaintiff's team, Maybel Marte, brought up the incident in a performance review discussion with Plaintiff. Marte told Plaintiff that she should have participated in the sweater holiday party, purchased and worn a Christmas holiday sweater – and that her failure to do so reflects that she is not committed to the team and does not observe sportsmanship, and that her failure to participate in team activities will reflect poorly in her performance and career mobility at BlackRock.

**Incident 7: Khusbhat Chaudhry's Contemporaneous Admission Of Retaliation Plan**

91. After filing her formal HR complaint in February 2019 and during the investigation period, Plaintiff engaged in text message communications with Khusbhat Chaudhry, then a Vice President in BlackRock's Human Resources department. Khusbhat Chaudhry was a senior HR executive with authority and responsibility over employment decisions, investigations, personnel matters, and implementation of company policy regarding discrimination and harassment complaints.

92. In these text messages—candid, real-time communications between Plaintiff and a senior HR executive—Chaudhry revealed BlackRock's predetermined plan to retaliate against Plaintiff by manufacturing a false performance case. Specifically, when discussing the harassment complaints Plaintiff had filed and concerns about retaliation, Chaudhry stated:

    a. "That has happened to a lot of folks" – acknowledging that multiple employees had experienced similar harassment and that BlackRock's response was retaliatory.
    b. "Because they'll try to make it a performance case" – explicitly admitting that BlackRock's standard procedure for retaliating against harassment

complainants is to fabricate ("make") a false performance case as pretext for termination.

c. "And with the stress I have it'll be easy for them to make that case subhan Allah" – admitting that BlackRock would weaponize Plaintiff's psychological distress (caused by the harassment she had reported) as a basis for constructing a pretextual performance case.




93. Chaudhry's phrase "they'll try to make it a performance case" is particularly damning because:

a. The word "make" indicates fabrication, not discovery of genuine performance deficiencies – if Plaintiff had legitimate performance problems, they would "find" or "identify" them, not "make" them.

b. Chaudhry's use of "try" indicates uncertainty about whether the false case would succeed, suggesting Chaudhry was discussing an adversarial plan against Plaintiff, not an objective performance evaluation.

c. The admission came from a HR Vice President, demonstrating this was not an isolated opinion but reflected institutional policy and understanding within BlackRock's HR leadership.
d. Chaudhry's statement "that has happened to a lot of folks" confirms this is a pattern and practice, affecting multiple employees.

94. This text conversation occurred BEFORE Plaintiff received her 2.0 performance rating. Therefore, it provides direct contemporaneous evidence that:
    a. BlackRock management had predetermined Plaintiff would receive a low performance rating.
    b. The rating would be manufactured ("made") as retaliation, not based on legitimate performance deficiencies.
    c. HR leadership (Chaudhry) was aware this was the plan and casually discussed it as standard procedure.
    d. The retaliation strategy included weaponizing Plaintiff's mental health deterioration (caused by the harassment and sham investigation) against her.
95. This text conversation directly corroborates Plaintiff's allegation that she was warned by senior mentors about BlackRock's "retaliation playbook" (paragraphs 57-59). Chaudhry's candid admission that "they'll try to make it a performance case" proves the playbook is real, is well-known among BlackRock HR executives, and was actively being implemented against Plaintiff.
96. Critically, Chaudhry's statement "easy for them to make that case" reveals the false nature of the coming performance rating. If Plaintiff's performance had genuinely been deficient, the case would not need to be artificially "made" and would not be "easy" to fabricate. The fact that Chaudhry described it as "easy for them to make" demonstrates Chaudhry expected a pretextual performance case to be constructed regardless of Plaintiff's actual performance.
97. As a HR Vice President, Khusbhat Chaudhry had direct authority and responsibility for:
    a. Overseeing HR investigations.
    b. Implementing company policy on harassment and discrimination complaints.
    c. Coordinating personnel decisions.
    d. Ensuring compliance with anti-retaliation provisions.
98. Yet Chaudhry admitted in text that BlackRock would fabricate a performance case ("make it a performance case") to retaliate against Plaintiff. This demonstrates that Chaudhry, as a senior HR executive, either (a) actively participated in the retaliation scheme, OR (b) had knowledge of the retaliation scheme and took no action to prevent it, both of which constitute violations of Plaintiff's legal rights and direct participation in the unlawful retaliation.

C. **Defendant Alli's Escalating Pattern of Sexual Harassment and Assault**

**Incident 1: September 2018 - Repeated Demands to Bend Over**

99. Beginning in or around September 2018 and continuing for several weeks, Defendant Alli had a small basketball (approximately the size of a grapefruit or softball) on his desk.

100. On multiple occasions—at least five to seven times over the course of several weeks—Defendant Alli intentionally rolled the basketball from his desk area toward Plaintiff's desk, causing it to land on the floor near Plaintiff's feet or under her desk.

101. Each time Defendant Alli rolled the basketball near Plaintiff, he insisted that Plaintiff bend over to pick it up for him, even though Alli was physically close to the ball and capable of retrieving it himself.

102. Defendant Alli watched Plaintiff as she bent over to pick up the basketball, and he repeated this conduct on numerous occasions.

103. Defendant Alli's repeated insistence that Plaintiff bend over to pick up objects for him was intended to objectify Plaintiff, force her into sexually suggestive positions, and assert dominance over her.

104. Plaintiff felt uncomfortable, demeaned, and objectified by this conduct but feared retaliation if she complained, given Defendant Alli's seniority and his influence over work assignments and evaluations.

**Incident 2: October 2, 2018 - Forcible Sexual Assault**

105. On October 2, 2018, at approximately midday (between 12:00 PM and 1:00 PM), Plaintiff was sitting at her assigned desk on the 7th floor trading floor, working on her computer.

106. Plaintiff was seated in her desk chair, facing her computer screen, with her back to the area behind her desk.

107. Without any warning, prior conversation, or consent, Defendant Alli approached Plaintiff from behind.

108. Defendant Alli then forcefully thrust his penis, genitals, and pelvic region into the back of Plaintiff's desk chair in a humping motion, making contact with the chair while Plaintiff was seated in it.

109. The force of Defendant Alli's thrusting was so aggressive and violent that it propelled Plaintiff forward in her chair and knocked her over her keyboard, mouse, and

other items in front of her, nearly knocking her computer monitor sideways due to how forceful his thrust was. Defendant Alli was simulating sexual intercourse by humping Plaintiff's chair while she sat in it, intentionally making forcible contact between his genitals and Plaintiff's body (through the intermediary of the chair).

110. This assault occurred on an open trading floor in full view of approximately ten of Plaintiff's colleagues, including but not limited to Sara Golshahr, Melissa Barnard, Charley Hung, Stanley Nunoo, and other employees whose identities will be ascertained through discovery.

111. After completing the assault, Defendant Alli remained standing behind Plaintiff, laughing and talking with colleagues who were seated nearby and who had witnessed the assault.

112. Plaintiff remained seated in her chair, frozen, shocked, stunned, and mortified. She could not process what had just happened to her.

113. Plaintiff heard Defendant Alli's voice behind her as he spoke to colleagues. When Plaintiff did not turn around to look at Defendant Alli, he said to colleagues seated behind Plaintiff, in a tone suggesting surprise or amusement: "Damn. I keep forgetting I'm like a decade older than her."

114. In reality, Defendant Alli is approximately twenty years older than Plaintiff, not one decade. His comment reflected his awareness of the significant power imbalance between himself (a senior Vice President in his early 40s) and Plaintiff (a junior analyst in her early 20s).

115. While frozen in her chair, Plaintiff thought to herself: "Oh my goodness. This is not just in my head" and "I cannot believe this just happened to me."

116. Shortly after the assault—within approximately 15 to 30 minutes—Plaintiff suffered a severe panic attack. She experienced difficulty breathing, rapid heartbeat, dizziness, and overwhelming fear and anxiety.

117. Plaintiff felt humiliated, violated, degraded, powerless, and unsafe in her workplace.

118. Defendant Alli's conduct on October 2, 2018 constitutes sexual assault under New York Penal Law because:

a. Intent: Defendant Alli intentionally approached Plaintiff from behind and intentionally thrust his genitals into her chair in a humping motion.
b. Forcible Contact: The contact was forcible, sufficient to propel Plaintiff forward and nearly knock her over.
c. Sexual/Intimate Parts: Defendant Alli made contact using his sexual and intimate parts (penis, genitals, pelvic region).
d. Lack of Consent: Plaintiff did not consent; she had no warning or opportunity to consent or object.
e. Purpose: The conduct was undertaken for the purpose of sexual gratification and/or degrading and abusing Plaintiff.

**Incident 3: October 11, 2018 - Public Threat of Sexual Touching**

119. On October 11, 2018—exactly nine days after the October 2 assault—at approximately 4:30 PM, Plaintiff was sitting at her desk working on her computer.

120. Plaintiff suddenly heard Defendant Alli's voice directly behind her.

121. Plaintiff turned slightly and realized that Defendant Alli was standing less than one foot (approximately 6 to 12 inches) directly behind her, positioning himself between Plaintiff's chair and the nearest obstacle or exit, thereby cornering her at her desk with no clear avenue of escape.

122. Defendant Alli extended his hand outward toward Plaintiff's body, holding his hand in a position suggesting he was about to touch her.

123. Defendant Alli then began loudly and repeatedly asking, in a voice audible to numerous colleagues: "Should I do it? Should I touch her? Does it count as sexual harassment if I touch her?"

124. Defendant Alli repeated these questions multiple times over the course of several minutes, directing them to approximately ten colleagues who were standing or sitting nearby and who had gathered to watch the spectacle.

125. The colleagues present included but not limited to Sara Golshahr, Mitchell Garfin, Roberto Langstroth, Melissa Barnard, David Delbos, and other employees whose identities will be ascertained through discovery.

126. Multiple male colleagues encouraged Defendant Alli, responding with statements such as:

a. "Yeah, do it, do it".
b. "He's not gonna do it".
c. "I know him, he's not gonna do it".

127. Sara Golshahr, a female colleague, explicitly and audibly told Defendant Alli: "It doesn't count as sexual harassment if you touch her."

128. Golshahr's statement was made in Plaintiff's hearing and signaled to Defendant Alli and other colleagues that Plaintiff, as a woman (and particularly as a Muslim woman), was a permissible target for sexual violence and that such conduct would not be treated as wrongful.

129. This incident lasted several minutes—not merely a few seconds. Throughout this time, Plaintiff sat frozen in her chair, paralyzed by fear and humiliation, while her colleagues watched, laughed, and encouraged Defendant Alli to sexually assault her.

130. Plaintiff did not speak, move, or respond. She felt trapped, terrified, and powerless.

131. Defendant Alli ultimately said, "I'm not gonna do it," and walked away from Plaintiff's desk. Some colleagues appeared amused by the entire incident.

132. Immediately after Defendant Alli walked away, Plaintiff stood up and rushed to find a close friend—a Latina female entry-level analyst who had joined BlackRock the same year as Plaintiff.

133. When Plaintiff saw her friend, she broke down crying and suffered another severe panic attack, experiencing difficulty breathing, rapid heartbeat, and overwhelming distress.

134. Plaintiff told her friend what had just happened.

135. This October 11 incident constitutes sexual harassment and a continuation of Defendant Alli's pattern of gender-based violence and demonstrates:

a. **Premeditation and Intent**: Alli deliberately returned to Plaintiff's desk nine days after the assault, his explicit reference to the possibility of touching Plaintiff again, and his solicitation of colleagues' opinions prove that the October 2 assault was intentional and that Alli was aware his conduct constituted sexual harassment.
b. **Gender-Based Animus**: The public nature of the incident—with colleagues watching, encouraging, and explicitly stating that sexual harassment of Plaintiff would not "count"—demonstrates that Alli targeted Plaintiff for sexual degradation because of her gender.
c. **Hostile Environment**: The October 11 incident demonstrates that Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and abuse based on her gender.

**Incident 4: October 18, 2018 - Continued Harassment**

136. On October 18, 2018—one week after the October 11 incident, while Plaintiff sat working at her desk, Defendant Alli came to Plaintiff's desk area and began openly

discussing with colleagues whether he should sexually harass Plaintiff again and what next advances to make toward her.

137. Plaintiff could hear Defendant Alli and other colleagues discussing her as if she were not present or as if her feelings and dignity did not matter.

138. Plaintiff became very quiet, kept her head down, and attempted to focus on her work, but she felt terrorized, unsafe, and trapped in her workplace.

139. This conduct further demonstrates Defendant Alli's ongoing pattern of sexually harassing Plaintiff and the complicity of other colleagues in creating and maintaining a hostile work environment.

**Incident 5: February 6, 2019 - Intimidation and Stalking Behavior**

140. On February 6, 2019, Defendant Alli came to work with a noticeably different appearance—he had altered his hairstyle, clothing, or grooming in a way that was apparent to colleagues.

141. At approximately 5:00 PM, Defendant Alli put on his jacket as if he were leaving the office for the day.

142. Defendant Alli typically exited the trading floor using the exit closest to his own desk, which was in the opposite direction from Plaintiff's workstation.

143. On this occasion, however, Defendant Alli walked over to Plaintiff's desk and began circling her desk slowly, pausing at various points around her workstation

144. Defendant Alli circled Plaintiff's desk for several minutes, staring at Plaintiff and positioning himself at different angles around her desk.

145. Several male colleagues, including Mitchell Garfin, stood behind Defendant Alli and encouraged him to continue circling Plaintiff's desk "to see what she thought of his new look."

146. Colleagues made comments such as: "Let's see if she checks him out" and similar remarks suggesting that they were treating Plaintiff as an object whose reaction to Defendant Alli's appearance was a source of amusement.

147. Plaintiff felt trapped, intimidated, frightened, and unsafe. She kept her eyes on her computer screen and did not acknowledge Defendant Alli or the colleagues encouraging him.

148. This incident reinforced that Defendant Alli viewed Plaintiff as an object for his amusement and sexual attention, and that Plaintiff's male colleagues encouraged and enabled his harassment and intimidation of her.

149. This conduct constitutes stalking, intimidation, and a continuation of the hostile work environment based on Plaintiff's gender.

D. **Plaintiff's Initial Complaint and Seat Change (October 2018)**

150. In or around mid-to-late October 2018—shortly after the October 2 and October 11 incidents—Plaintiff complained to her direct manager, Hilary Thorndike (Vice President), about Defendant Alli's sexual harassment and assault.

151. Plaintiff described to Thorndike the October 2 assault and the October 11 public threat of sexual touching.

152. Plaintiff told Thorndike that she felt unsafe and uncomfortable working in close proximity to Defendant Alli.

153. Plaintiff requested that her seat be moved to a location on the trading floor that was further away from Defendant Alli in order to create physical distance and reduce the harassment.

154. Upon information and belief, Thorndike escalated Plaintiff's complaint to Maybel Marte (Managing Director and head of Plaintiff's team).

155. Upon information and belief, Marte approved Plaintiff's request for a seat change.

156. Plaintiff's desk was moved to a new location on the trading floor that was further from Defendant Alli's desk (though still on the same open floor and still within Defendant Alli's ability to approach).

157. However, the sexual harassment did not end after the seat change.

158. As evidenced by Defendant Alli's continued harassment on October 18, 2018 and February 6, 2019, the seat change was insufficient to protect Plaintiff or to stop Defendant Alli's pattern of harassment and intimidation.

159. Moreover, the pervasive racism, Islamophobia, and religious discrimination Plaintiff continued to face from multiple other colleagues did not end after the seat change. While Plaintiff was moved farther from Alli, her new seat was closer to Peter Hirsh and Roberto Langstroth, whose public rebukes, racist and Islamophobic comments only escalated when she sat in closer proximity to them.

160. The seat change was a band-aid measure that failed to address the root cause of the problem: BlackRock's toleration of sexual harassment, assault, and discrimination on its trading floor.

E. **Plaintiff's Warnings Regarding BlackRock's Retaliation Playbook (Pre-Complaint)**

161. Prior to filing her formal HR complaint in February 2019, Plaintiff consulted with senior Muslim employees and experienced colleagues at BlackRock who had experience with the company's handling of discrimination and harassment issues.

162. Upon information and belief, these senior mentors—including at least one Muslim male employee with multi-year experience at BlackRock—warned Plaintiff of a known pattern or "playbook" that BlackRock allegedly used to retaliate against employees who filed discrimination or harassment complaints.

163. Specifically, upon information and belief, Plaintiff was warned that if she filed a formal HR complaint, BlackRock would likely:

a. Conduct a sham investigation that clears the harasser.
b. Move Plaintiff to another team or group (moving the victim, not the harasser).
c. Give Plaintiff a low performance rating (specifically, a "1" or "2" rating) in the next review cycle.
d. Place Plaintiff on a Performance Improvement Plan (PEP).
e. Use the PEP and low ratings as pretext to terminate Plaintiff or force her resignation.
f. Khusbhat Chaudhry explicitly previewed this retaliation in text messages, with HR staff stating BlackRock would "make" a performance case against Plaintiff (paragraphs 84-90); (f) The phrase "easy for them to make that case" proves the rating was manufactured, not based on genuine performance deficiencies".

164. Plaintiff's mentors stated that they had personally witnessed this pattern occur repeatedly with other employees of color and female employees who complained about discrimination or harassment at BlackRock.

165. Despite this warning and despite her fear of retaliation, Plaintiff filed a formal complaint with HR in February 2019 because the harassment had become intolerable and she had no choice but to report it. She also filed the report due to urgent nudging from her mental health providers, who insisted she could not tolerate further mental health damages as a result of this work environment and needed urgent intervention to preserve her mental and physical health.

166. Upon information and belief, BlackRock then executed this exact retaliation playbook against Plaintiff, as detailed below.

F. **Plaintiff's Attempts to Transfer to a Different Team (Late 2018 - Early 2019)**

167. In late 2018 and early 2019, as the harassment and hostile work environment continued, Plaintiff sought assistance from senior leaders at BlackRock to transfer her out of the Credit Product Strategy team and away from Defendant Alli and other harassers.

168. Plaintiff spoke with the following senior leaders, among others, about her need to transfer:

a. Upon information and belief: Jonathan McBride - Managing Director and BlackRock's Chief Diversity Officer at the time.
b. Upon information and belief: Amer Bisat - Managing Director.
c. Upon information and belief: Gargi Chaudhuri - Managing Director.
d. Upon information and belief: Matthew Breitfelder - Managing Director in Human Resources.

169. Plaintiff explained to these senior leaders that she was experiencing sexual harassment, racism, Islamophobia, and a hostile work environment, and that she urgently needed help transferring to a different team where she could work safely.

170. Plaintiff emphasized to these leaders that the harassment was ongoing, severe, and affecting her mental and physical health.

171. Upon information and belief, despite Plaintiff's pleas for help, none of these senior leaders took meaningful action to transfer Plaintiff or to address the harassment and discrimination she faced.

172. Upon information and belief, these senior leaders failed to escalate Plaintiff's complaints to Human Resources or Employee Relations for formal investigation.

173. Upon information and belief, these senior leaders failed to take any steps to separate Plaintiff from her harassers or to discipline the employees who were harassing her.

G. **Complaint to Female Executive—Normalization of Sexual Harassment as Inevitable**

174. Between October 2018 and February 2019, as Plaintiff continued to suffer ongoing sexual harassment, assault, racism, and Islamophobia at BlackRock, Plaintiff sought guidance and support from senior female executives at BlackRock.

175. Plaintiff spoke with Maybel Marte, a Managing Director**,** about her experiences of sexual harassment and assault by Defendant Alli and the hostile work environment she faced based on her gender, religion, and national origin.

176. During this conversation, Plaintiff explained to Managing Director the specific incidents of sexual assault (October 2, 2018), the public threat of sexual touching (October

11, 2018), and the ongoing pattern of sexual harassment and discrimination she had endured.

177. Rather than express support, sympathy, or a commitment to help remedy the situation, Maybel Marte responded to Plaintiff by stating—in substance and effect—that "Plaintiff may not be cut out for a career in financial services" if she could not tolerate or accept sexual harassment and assault as a normal part of working in the industry. Marte also told Plaintiff that she is at the "bottom of the food chain" and easily "replaceable" as an entry-level analyst, and that Plaintiff would be easily replaced by another analyst if she made "noise." Marte told Plaintiff that BlackRock has "deep networks" with connections across the entire financial services industry, and that BlackRock can destroy her career regardless of which company she moves to. For this reason, Plaintiff was terrified of officially filing complaints with HR and taking steps to escalate the matter into a formal HR investigation, out of fear of retaliation by BlackRock whether internally or if she moved to another company.

178. By making this statement, Marte communicated to Plaintiff that:

a. Sexual harassment and assault of women is a normal, expected, and unavoidable part of working in financial services.
b. Women who want "long careers" in finance must simply accept sexual harassment as an occupational hazard.
c. Plaintiff's objection to being sexually assaulted was unreasonable and indicated she was unfit for the industry.
d. BlackRock's workplace culture would not change, and Plaintiff's only option was to accept the harassment or leave.

179. This statement by a senior female executive was particularly damaging and psychologically harmful because:

a. It came from a woman in a position of authority, who ostensibly should have been sympathetic to gender-based workplace harassment.
b. It communicated that even BlackRock's female leadership viewed sexual harassment of women as inevitable and acceptable.
c. It suggested that Plaintiff—not the harassers—was the problem if she refused to tolerate sexual assault.
d. It shifted responsibility for the harassment from the perpetrators and the company to Plaintiff herself.
e. It demonstrated institutional acceptance and normalization of sexual harassment within BlackRock's culture.

180. Marte's statement also constituted a form of retaliation and discouraged Plaintiff from reporting her experiences or seeking help from BlackRock's female leaders, knowing

that such complaints would be met not with support but with the message that she was "not cut out" for the industry.

181. This incident demonstrates that BlackRock's institutional culture—at the level of senior female leadership—normalized and accepted sexual harassment and assault as an inevitable part of women's employment in financial services, rather than treating it as unlawful discrimination that should be prevented and remedied.

182. Plaintiff was devastated and traumatized by this response. Rather than receiving support and advocacy from a senior female executive, she received a message that she was the problem—that her unwillingness to be sexually assaulted made her unsuitable for her chosen career.

183. This interaction reinforced Plaintiff's fear that reporting her harassment to BlackRock would be futile and would instead result in retaliation and blame-shifting, rather than meaningful investigation and discipline of the harasser.

H. **Plaintiff's Formal Complaint to Human Resources (February 2019)**

184. By February 2019, Plaintiff's mental and physical health had severely deteriorated due to the ongoing sexual harassment, assault, racism, Islamophobia, and hostile work environment.

185. Plaintiff began experiencing:

a. Post-Traumatic Stress Disorder (PTSD) symptoms, including intrusive thoughts, flashbacks, hypervigilance, and avoidance of triggers.
b. Severe anxiety disorder, including panic attacks, difficulty breathing, rapid heartbeat, and overwhelming feelings of dread.
c. Situational depression, including persistent sadness, hopelessness, and difficulty concentrating.
d. Physical symptoms including high blood pressure, frequent stress-induced nosebleeds, headaches, stomach problems, and difficulty sleeping.

186. Plaintiff's psychologist diagnosed her with PTSD, anxiety disorder, and situational depression, all directly resulting from her experiences at BlackRock.

187. Plaintiff felt she had no choice but to file a formal written and oral complaint with BlackRock's Human Resources department, despite her fear of retaliation.

188. In or around early-to-mid February 2019, Plaintiff contacted BlackRock's Employee Relations department and requested a meeting to report the harassment, assault, and discrimination she had experienced.

189. Plaintiff met with Alex Reynolds of Employee Relations and Jennifer Snape of Human Resources for a meeting that lasted approximately two hours.

190. During this meeting, Plaintiff presented a report-out of a detailed written spreadsheet she had personally created documenting her experiences.

191. The spreadsheet contained the following information for each incident of harassment, assault, and discrimination:

a. Exact dates (month, day, and year).
b. Approximate times of day.
c. Exact locations (e.g., "7th floor trading floor, at my desk," "near Mitchell Garfin's desk," etc.).
d. Specific descriptions of the conduct (e.g., verbatim quotes of what was said, physical descriptions of what occurred).
e. Names of witnesses who were present and who could corroborate Plaintiff's account.

192. The spreadsheet documented numerous incidents of sexual harassment by Defendant Alli, racism and Islamophobia by multiple colleagues, and the hostile work environment Plaintiff endured.

193. Plaintiff specifically identified approximately ten witnesses to the October 11, 2018, incident in which Defendant Alli publicly threatened to sexually touch Plaintiff and solicited colleagues' encouragement.

194. Plaintiff also informed Reynolds and Snape that BlackRock had security cameras installed throughout the 7th floor trading floor that would have captured video footage of Defendant Alli's conduct on October 2, 2018, and October 11, 2018.

195. Plaintiff requested that Reynolds and Snape review the security camera footage as part of their investigation.

196. During the two-hour meeting, Plaintiff suffered multiple panic attacks due to the stress and trauma of recounting the incidents.

197. Plaintiff also suffered a severe nosebleed during the meeting caused by high blood pressure and extreme anxiety.

198. Reynolds and Snape observed Plaintiff's panic attacks and nosebleed, which provided evidence of the severe emotional and physical harm Plaintiff had suffered.

199. At the conclusion of the meeting, Alex Reynolds and Jennifer Snape informed Plaintiff that BlackRock would launch a formal investigation into her allegations of sexual harassment, assault, racism, Islamophobia, and hostile work environment.

200. Reynolds and Snape told Plaintiff that they would interview witnesses and review evidence, and that they would follow up with Plaintiff regarding the results of the investigation.

201. Plaintiff reasonably believed that BlackRock would conduct a thorough, good-faith investigation and would take appropriate disciplinary action against Defendant Alli and other harassers.

**I. BlackRock's Sham Investigation and Failure to Take Remedial Action (February - May 2019)**

202. Upon information and belief, following Plaintiff's February 2019 complaint, BlackRock purported to conduct an investigation into Plaintiff's allegations.

203. Upon information and belief, the investigation lasted approximately three months—from February 2019 through May 2019.

204. Upon information and belief, during this time, Plaintiff was not provided with regular updates regarding the status or progress of the investigation.

205. Plaintiff continued to work on the same trading floor as Defendant Alli and other harassers during the investigation, causing ongoing stress, fear, and anxiety.

**Reynolds' False Accusation and Investigation Results**

206. On May 9, 2019, Alex Reynolds contacted Plaintiff via telephone to inform her of the investigation results.

207. At the beginning of the May 9, 2019 call—before discussing the investigation results—Alex Reynolds raised concerns about conduct by Plaintiff related to communications or publications, stating that Jonathan McBride (BlackRock's Chief Diversity Officer) had raised questions about whether Plaintiff had obtained proper approval.

208. Reynolds communicated that this conduct could be a problem for Plaintiff's continued employment.

209. Plaintiff responded to Reynolds' concerns and explained her position regarding the matter.

210. Upon receiving Plaintiff's explanation, Reynolds's tone shifted and he proceeded with discussing the investigation results.

211. This exchange at the beginning of the call was indicative of BlackRock's pattern of looking for pretexts and leverage against Plaintiff in retaliation for her complaints.

**Investigation Results: "No Evidence" of Sexual Harassment**

212. After the initial exchange, Reynolds proceeded to inform Plaintiff of the results of BlackRock's investigation into her harassment and discrimination complaints.

213. Reynolds informed Plaintiff that, after conducting its investigation, BlackRock "could not find evidence to corroborate [Plaintiff's] claims" regarding sexual harassment by Defendant Alli.

214. Reynolds stated that BlackRock's investigation had concluded that there was "no evidence" to support Plaintiff's allegations of sexual assault and harassment.

215. Plaintiff was shocked, devastated, and disbelieving.

216. Plaintiff had provided:

a. Exact dates for each incident (October 2, 2018; October 11, 2018; October 18, 2018; February 6, 2019).
b. Exact locations (7th floor trading floor, at or near Plaintiff's desk).
c. Detailed descriptions of Defendant Alli's conduct.
d. Names of approximately ten witnesses who were present during the October 11, 2018 incident and who could corroborate that Defendant Alli publicly threatened to touch Plaintiff and solicited colleagues' opinions on whether it would "count as sexual harassment".
e. Specific identification of Sara Golshahr, who explicitly told Defendant Alli "It doesn't count as sexual harassment if you touch her".
f. Notice that BlackRock had security camera footage that would have captured Defendant Alli's conduct.

217. Despite this overwhelming evidence, BlackRock's purported "investigation" concluded there was "no evidence."

218. Upon information and belief:

a. BlackRock failed to interview many or all of the witnesses Plaintiff identified.
b. BlackRock failed to review security camera footage from the 7th floor trading floor.
c. BlackRock failed to conduct a thorough, good-faith investigation.
d. BlackRock predetermined the outcome in order to protect Defendant Alli (a more senior, male employee) and to avoid liability for sexual harassment and assault.

219. Upon information and belief, BlackRock's "investigation" was a sham designed to give the appearance of taking Plaintiff's complaint seriously while in reality protecting the harasser and blaming the victim.

**Investigation Results: Minimal Response to Racism and Islamophobia**

220. As for the racism and Islamophobia Plaintiff experienced from multiple colleagues (including Mitchell Garfin, Sara Golshahr, Peter Hirsh, Roberto Langstroth, and others), Reynolds informed Plaintiff that:

a. One colleague would be sent to counseling to learn "more sensitive communication"; and]
b. The division would receive diversity training.

221. Upon information and belief, Reynolds did not provide any details about the counseling or training.

222. Reynolds did not inform Plaintiff of any disciplinary action taken against any colleague for the racist, Islamophobic, or religiously discriminatory conduct.

223. These minimal responses—counseling for one olleague and generic diversity training—were wholly inadequate given the severity, pervasiveness, and duration of the harassment and discrimination Plaintiff experienced.

**BlackRock Took No Disciplinary Action Against Defendant Alli**

224. BlackRock took absolutely no disciplinary action against Defendant Alli.

225. Defendant Alli was not terminated, suspended, demoted, reprimanded, or subjected to any consequences for sexually assaulting and harassing Plaintiff.

226. Defendant Alli continued to work on the same trading floor as Plaintiff after the investigation concluded.

227. BlackRock's failure to discipline or terminate Defendant Alli sent a clear message to Plaintiff and to all BlackRock employees that sexual assault and harassment would be tolerated, protected, and excused.

**Offer to Transfer Plaintiff (Not the Harasser).**

228. At the conclusion of the May 9, 2019 call, Reynolds offered Plaintiff a transfer to another team within BlackRock, potentially in a different BlackRock office or location.

229. Reynolds did not offer to transfer Defendant Alli or any other harasser.

230. Plaintiff recognized this as the exact scenario her mentors had warned her about: BlackRock was attempting to move Plaintiff (the victim) rather than discipline or terminate Defendant Alli (the perpetrator).

231. Plaintiff reasonably believed that if she accepted the transfer, BlackRock would:

a. Isolate her from her support network of colleagues and mentors.

b. Scrutinize her performance and look for pretexts to terminate her.
c. Use vague "performance-related" arguments to force her out of the company within a few months.

232. Plaintiff had witnessed this pattern happen to other employees of color and female employees at BlackRock who complained about discrimination or harassment.

233. Plaintiff felt trapped: if she stayed in her current role, she would continue to be subjected to harassment and a hostile environment with no meaningful protection from BlackRock; if she accepted the transfer, she would likely be pushed out of the company through manufactured performance issues.

J. **Retaliation Through Pretextual Performance Ratings**

234. In addition to the conduct described above, BlackRock retaliated against Plaintiff by subjecting her to unfair and pretextual performance ratings designed to justify her eventual forced departure from the company.

235. At the conclusion of her first year of employment at BlackRock (calendar year 2018), Plaintiff received a year-end performance rating of 2.0 (on a scale where 3 is considered "meets expectations" and 2 is considered "needs improvement").

236. Plaintiff's 2.0 rating was discriminatory, pretextual, and retaliatory, as evidenced by:

a. Comparable colleagues, including named individuals Axilrod and Ke Chen, received ratings of 3.0 for performing similar or lesser work than Plaintiff.
b. Upon information and belief, BlackRock HR personnel, including Jessica Palacious, acknowledged internally that Plaintiff's 2.0 rating was below what comparable male and non-Arab colleagues received, as evidenced by Palacious's communications regarding "advice" on how to justify Plaintiff's low rating.
c. Plaintiff had received positive feedback from mentors and supervisors regarding her performance, work ethic, and potential.
d. The low rating was timed immediately around Plaintiff's formal complaint to HR in February 2019 about sexual assault and harassment, suggesting it was retaliatory in nature.
e. The low rating was used by BlackRock as a pretext to justify Plaintiff's eventual constructive discharge.

237. Upon information and belief, BlackRock utilized low performance ratings as part of its standard "playbook" for handling employees who complained about discrimination or harassment.

238. Plaintiff's 2.0 rating was part of this retaliatory scheme.

///

K. **Plaintiff's Constructive Discharge (June 2019)**

239. Following the May 9, 2019, sham investigation results, Plaintiff's work environment became completely intolerable.

240. The cumulative effect of:

a. Defendant Alli's sexual assault and ongoing harassment (October 2018 through February 2019).
b. Pervasive racism, Islamophobia, and religious discrimination from multiple colleagues.
c. BlackRock's deliberate indifference and failure to protect Plaintiff despite her detailed complaints.
d. BlackRock's sham investigation that ignored substantial evidence and multiple witnesses.
e. BlackRock's retaliation through communications that created concerns about her continued employment.
f. BlackRock's failure to discipline Defendant Alli or any other harasser.
g. BlackRock's low performance rating discrimination.
h. BlackRock's offer to transfer Plaintiff (the victim) rather than Defendant Alli (the perpetrator).
i. Senior female executive's message that Plaintiff was not "cut out" for the industry because she would not tolerate sexual harassment created working conditions so severe and pervasive that a reasonable person in Plaintiff's position would have felt compelled to resign.

241. Plaintiff's mental and physical health had deteriorated to the point where continuing to work at BlackRock posed a serious risk to her well-being and safety.

242. Plaintiff's psychologist advised her that continuing in the hostile environment at BlackRock could cause permanent psychological damage.

243. In late-May 2019, weeksafter the May 9, 2019, investigation results call, Plaintiff resigned from her employment at BlackRock.

244. Plaintiff's resignation was not voluntary. It constituted a constructive discharge.

245. Plaintiff did not leave because she wanted to pursue other opportunities or because she was dissatisfied with the work itself. She left because BlackRock's unlawful conduct—sexual assault, harassment, discrimination, deliberate indifference, retaliation, and failure to remedy—made it impossible for her to continue working there.

246. Plaintiff was forced out by Defendants' unlawful conduct.

///
///
///
///

L. **BlackRock's Promotion of Defendant Alli After Plaintiff's Departure**

247. Upon information and belief, in or around July or August 2019—shortly after Plaintiff's June 2019 resignation—BlackRock promoted Defendant Alli from the position of Vice President to the position of Director.

a. Upon information and belief, this promotion involved:
   i. An increase in Defendant Alli's compensation.
   ii. Greater authority and responsibility within BlackRock.
   iii. Enhanced prestige and career advancement.

248. By promoting Defendant Alli after receiving detailed, documented allegations of his sexual harassment and assault of Plaintiff, BlackRock sent an unmistakable message that:

a. Sexual harassment and assault would be tolerated at BlackRock.
b. Harassers would be rewarded and protected rather than disciplined or terminated.
c. Victims who complained would be pushed out while perpetrators would be promoted.

249. Upon information and belief, BlackRock's promotion of Defendant Alli demonstrates:

a. BlackRock's deliberate indifference to sexual harassment and assault.
b. BlackRock's bad faith in conducting its purported "investigation" of Plaintiff's complaints.
c. BlackRock's prioritization of protecting senior male employees over protecting female employees and employees of color.
d. BlackRock's ratification and endorsement of Defendant Alli's conduct.

250. Upon information and belief, Defendant Alli continues to be employed by BlackRock as of the filing of this Amended Complaint, holding the position of Director or a higher position.

M. **BlackRock's Post-Hoc Investigation and Admission of Wrongdoing (November 2023)**

251. Upon information and belief, BlackRock commissioned an outside investigation by the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP to conduct a review of workplace complaints and investigations in response to media reports and mounting employee concerns.

252. On November 21, 2023—the same date that Plaintiff filed her original complaint in state court, and days before the Adult Survivors Act lookback window expired—BlackRock's Chief Executive Officer, Larry Fink, issued an internal memorandum to all

BlackRock staff announcing the results of the Paul Weiss investigation and BlackRock's "action plan" in response.

253. In this memorandum, CEO Fink admitted that:

a. "Several current and former BlackRock employees described instances of workplace misconduct they experienced at BlackRock".
b. "Some of the incidents had been contemporaneously reported to HR and investigated, but the reporting employees were dissatisfied with the way their concerns were addressed at the time".
c. "Other incidents had not been previously reported to HR".
d. Paul Weiss had reviewed BlackRock's prior investigative files and found them deficient, requiring re-investigation of previously investigated matters.
e. BlackRock had "experiences that did not meet what we should expect of BlackRock" and that the company needed to "continue to improve and do more."

254. Upon information and belief, CEO Fink's admission that employees were "dissatisfied with the way their concerns were addressed" directly applies to Plaintiff, whose complaints in October 2018 and February 2019 were met with a sham investigation that concluded there was "no evidence" despite Plaintiff's detailed spreadsheet and approximately ten identified witnesses.

255. Upon information and belief, BlackRock's engagement of Paul Weiss and the timing of this memorandum—issued just days before the Adult Survivors Act lookback window expired—was part of a strategy to:

a. Conduct a post-hoc "damage control" investigation.
b. Appear responsive to employee concerns and regulatory pressure.
c. Minimize potential litigation exposure by demonstrating that BlackRock was "taking action".
d. Continue to shield the identities of specific harassers and avoid public accountability.

256. Notably, the November 21, 2023, memorandum does not mention Defendant Alexander Alli or any discipline imposed on him. Upon information and belief, Defendant Alli continued to be employed by BlackRock in a senior position.

257. The post-hoc engagement of Paul Weiss and the subsequent "action plan" announced in the November 21, 2023, memorandum do not cure BlackRock's prior deliberate indifference to Plaintiff's complaints or excuse the sham investigation conducted in May 2019. Rather, this subsequent conduct demonstrates that BlackRock was aware its prior investigative and disciplinary processes were inadequate and took action only after significant pressure forced the issue.

258. Upon information and belief, BlackRock barely made any changes. They just tweaked some internal policies (eg, if you want to file a report to HR you can bring a friend at the company for moral support). Defendants BlackRocks employees continue to reach out to Plaintiff to this day with complaints about BlackRock's HR policies and their experiences of discrimination there. So in practice, nothing changed!

N. **Plaintiff's Ongoing and Permanent Harm**

259. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer severe, permanent, and debilitating physical, psychological, emotional, and economic harm, including but not limited to:

**Psychological Injuries**

260. Post-Traumatic Stress Disorder (PTSD), including:

a. Intrusive, distressing memories and flashbacks of the assault and harassment.
b. Nightmares and sleep disturbances.
c. Severe anxiety when encountering triggers related to the trauma (including male authority figures, open office spaces, and financial services workplaces).
d. Hypervigilance and exaggerated startle response.
e. Avoidance of places, people, and situations that remind Plaintiff of the trauma.
f. Negative alterations in mood and cognition, including persistent feelings of fear, horror, shame, and guilt.

261. Severe Anxiety Disorder, including:

a. Frequent panic attacks (rapid heartbeat, difficulty breathing, dizziness, overwhelming fear).
b. Generalized anxiety about workplace environments and interactions with colleagues and supervisors.
c. Social anxiety and difficulty trusting new acquaintances with ease, particularly in professional settings.

262. Situational Depression, including:

a. Persistent sadness, hopelessness, and loss of interest in activities.
b. Difficulty concentrating and making decisions.
c. Feelings of worthlessness and self-blame.

263. Physical Injuries and Symptoms:

a. High blood pressure (hypertension) caused by chronic stress and anxiety.
b. Frequent nosebleeds related to high blood pressure.
c. Headaches and migraines.
d. Gastrointestinal problems (stomach pain, nausea) related to anxiety.
e. Difficulty sleeping, including insomnia and disrupted sleep patterns.
f. Chronic fatigue and exhaustion.

///
///
///

**Economic Damages.**

264. Loss of employment and income: Plaintiff was forced to resign from a well-paying position at one of the world's leading asset management firms.

265. Loss of career opportunities in the financial services industry: Due to the trauma Defendants inflicted, Plaintiff has been unable to return to work in bulge-bracket (large-scale) firms in the financial services industry for years, foreclosing numerous high-paying career opportunities.

266. Lost wages: Plaintiff has lost hundreds of thousands of dollars in wages she would have earned had she been able to continue her career at BlackRock or at other similar financial services firms.

267. Lost benefits: Plaintiff has lost valuable employment benefits, including health insurance, retirement contributions, bonuses, and stock options.

268. Loss of future earning capacity: Plaintiff's career trajectory has been permanently altered. Had she remained employed at BlackRock, she would have been promoted to associate, vice president, and potentially managing director or partner-level positions, earning millions of dollars over the course of her career. These opportunities have been foreclosed.

269. Medical and psychological treatment expenses: Plaintiff has incurred and will continue to incur substantial expenses for ongoing mental health treatment, including therapy and medication.

**Emotional and Dignitary Harm.**

270. Severe emotional distress, including feelings of violation, degradation, humiliation, powerlessness, fear, and betrayal.

271. Loss of dignity and self-worth.

272. Damage to Plaintiff's sense of safety and security, particularly in workplace environments.

273. Loss of trust in employers, colleagues, and Human Resources departments.

274. Fear and insecurity about returning to the workforce.

///
///
///
///

**Ongoing Treatment and Prognosis.**

275. Plaintiff requires ongoing mental health treatment, including regular therapy sessions and medication, to address the PTSD, anxiety disorder, and depression caused by Defendants.

276. Upon information and belief based on consultations with Plaintiff's treating psychologists and therapists, Plaintiff's psychological injuries are permanent or long-lasting and will require ongoing treatment for the foreseeable future.

277. Despite treatment, Plaintiff continues to experience symptoms of PTSD, anxiety, and depression on a regular basis.

278. Plaintiff has been unable to return to work in the financial services industry due to the trauma associated with that environment.

279. Plaintiff's disability insurance claim was denied by the insurer representing BlackRock, with the insurer stating that despite the diagnosis of PTSD, anxiety disorder, and depression, Plaintiff's symptoms did not rise to the level of disability. This denial, despite clear diagnoses from treating mental health professionals, further demonstrates the severity of the trauma—the condition is so severe that Plaintiff cannot work, yet even the insurer's stringent disability standards recognized the existence of significant psychological injury.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Battery/ Assault/Sexual Assault**
**(Against Individual Defendant)**

280. Ms. Bengabsia incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

281. Defendant Alli committed battery against Plaintiff by intentionally engaging in offensive and harmful physical contact without her consent. On October 2, 2018, Defendant Alli approached Plaintiff from behind while she was seated at her desk and forcefully humped her chair with his crotch.

282. This act of forcible touching was calculated to humiliate and degrade Plaintiff in a professional environment. Under New York Penal Law § 130.52, such intentional and non-

consensual physical contact constitutes battery. see *Bastein v. Sotto*, 299 AD2d 432, 433 [2d Dept 2002].

283. Further, Defendant Alli committed assault by causing Plaintiff to fear imminent and harmful physical contact. On October 11, 2018, Defendant Alli stood uncomfortably close to Plaintiff, within one foot of her chair, extended his hand toward her, and verbally taunted her with statements such as, "Should I do it? Should I touch her? Does it count as sexual harassment if I touch her?"

284. His threatening proximity, coupled with his verbal threats, created a credible apprehension of imminent physical harm in Plaintiff, satisfying the elements of assault under New York Penal Law § 120.15.

285. Defendant Alli's behavior demonstrates a deliberate and escalating pattern of harassment and misconduct. Starting with inappropriate verbal comments, Defendant Alli's actions progressed to physical misconduct and explicit threats of unwanted contact.

286. This escalation was exacerbated by the complicit behavior of colleagues who encouraged or ignored Defendant Alli's actions, fostering a hostile and unsafe work environment.

287. The physical and psychological toll of Defendant Alli's actions on Plaintiff was severe. As documented by medical professionals, Plaintiff suffered from post-traumatic stress disorder (PTSD), anxiety, and significant emotional distress.

288. These injuries are directly attributable to the repeated battery and assault inflicted by Defendant Alli and BlackRock's failure to act. Plaintiff's trauma resulted in physical manifestations, including panic attacks and difficulties with concentration, further impairing her ability to perform her job responsibilities. see *Doe v. Guthrie Clinic, Ltd.*, 22 NY3d 480, 484-485 [2014].

289. Defendant Alli's conduct was not only intentional but also malicious, undertaken with the aim of exercising control and power over Plaintiff through fear and intimidation. Such behavior warrants the imposition of punitive damages to hold Defendant Alli accountable and deter similar conduct in the future. Under New York law, punitive damages are appropriate where a defendant's actions reflect a reckless or wanton disregard for the rights of others. *Walker v. Sheldon*, 10 NY2d 401, 404 [1961].

290. Plaintiff's claims are timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j, and pursuant to the lookback window provided by the Victims of Gender-Motivated Violence Act (VGMVA), N.Y.C. Admin. Code § 10-1105.

291. The acts described constitute sexual offenses as defined in Article 130 of the New York Penal Law. Plaintiff seeks compensatory damages for the physical, emotional, and psychological injuries sustained, as well as punitive damages to address the malicious nature of Defendant Alli's conduct and to prevent recurrence of such actions in any professional environment.

292. Alli's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to sexual misconduct (§130.20), and forcible touching (§ 130.52).

## Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

<u>Declaratory Relief</u>:

293. A declaration that the acts and practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, and other applicable laws.

<u>Injunctive Relief</u>:

294. An injunction requiring Defendants to implement policies, procedures, and training programs to ensure compliance with anti-discrimination and harassment laws.

295. An order requiring Defendants to establish independent oversight of internal complaints to prevent future incidents of harassment, discrimination, and retaliation.

<u>Compensatory Damages</u>:

296. An award of compensatory damages in an amount to be determined at trial, including but not limited to compensation for physical injuries, emotional distress, mental anguish, loss of reputation, humiliation, and other non-economic damages.

<u>Economic Damages</u>:

297. An award of economic damages for lost wages, lost benefits, diminished earning capacity, and other financial losses resulting from Defendants' conduct.

<u>Punitive Damages</u>:

298. An award of punitive damages to punish Defendants for their willful, malicious, and egregious misconduct and to deter similar conduct in the future.

Attorneys' Fees and Costs:

299. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

<u>Pre- and Post-Judgment Interest</u>:

300. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

<u>Any Other Relief</u>:

301. Such other and further relief as this Court deems just and proper under the circumstances.

302. Plaintiff demands a trial by jury on all issues so triable.

## SECOND CAUSE OF ACTION

### Negligent Infliction Of Emotional Distress

303. Ms. Bengabsia incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

304. Defendants' conduct created a substantial and unreasonable risk of causing severe emotional distress to Plaintiff. Defendant Alli's repeated and escalating acts of harassment, intimidation, and physical misconduct, combined with BlackRock's systemic failure to take timely and appropriate remedial action, foreseeably caused Plaintiff significant and ongoing emotional distress.

305. Defendant Alli's actions included egregious incidents such as the October 2, 2018, episode where he intentionally and forcefully humped Plaintiff's chair in a public display of degradation and the October 11, 2018, event where he verbally threatened physical contact while mocking the concept of harassment.

306. These acts were not isolated but part of a sustained pattern of abusive behavior that created a hostile and traumatic work environment for Plaintiff. BlackRock's negligence in addressing these behaviors despite repeated complaints not only enabled Defendant Alli but also signaled an organizational culture of indifference to employee welfare.

307. Courts have recognized that employers who fail to address severe harassment and intimidation can be held liable for negligent infliction of emotional distress. For instance, in *Kennedy v. McKesson Co.*, 58 NY2d 500, 504-505 (1983), the Court of Appeals acknowledged the employer's duty to act where workplace conditions foreseeably lead to emotional harm. Similarly, *Howell v. New York Post Co.*, 81 NY2d 115, 121 (1993) emphasizes that conduct exceeding the bounds of decency and creating foreseeable emotional harm establishes a claim for emotional distress.

308. Plaintiff's resulting emotional injuries, including severe anxiety, frequent panic attacks, and post-traumatic stress disorder, are well-documented by medical professionals. The foreseeability of these injuries is evident given the severity of Defendant Alli's conduct, the power dynamics at play, and BlackRock's persistent inaction.

309. By failing to protect Plaintiff from continued harassment and intimidation, BlackRock directly contributed to the amplification of her emotional harm (see *Doe v. Guthrie Clinic, Ltd.*, 22 NY3d 480, 484-485 [2014], holding that systemic neglect can heighten emotional distress).

310. Defendants' conduct was reckless, wanton, and demonstrated a flagrant disregard for Plaintiff's safety and well-being. BlackRock's failure to establish effective safeguards against harassment, its complicit silence in the face of ongoing abuse, and its neglect in addressing Plaintiff's complaints demonstrate a systemic breach of duty owed to its employees.

311. This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022) because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

## Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

Declaratory Relief:

312. A declaration that the acts and practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, and other applicable laws.

Injunctive Relief:

313. An injunction requiring Defendants to implement policies, procedures, and training programs to ensure compliance with anti-discrimination and harassment laws.

314. An order requiring Defendants to establish independent oversight of internal complaints to prevent future incidents of harassment, discrimination, and retaliation.

315. Mandating that BlackRock provide annual reports to the Court on the status and outcomes of harassment and discrimination complaints for a period of five years.

Compensatory Damages:

316. An award of compensatory damages in an amount to be determined at trial, including but not limited to compensation for physical injuries, emotional distress, mental anguish, loss of reputation, humiliation, and other non-economic damages.

Economic Damages:

317. An award of economic damages for lost wages, lost benefits, diminished earning capacity, and other financial losses resulting from Defendants' conduct.

Punitive Damages:

318. An award of punitive damages to punish Defendants for their willful, malicious, and egregious misconduct and to deter similar conduct in the future.

Attorneys' Fees and Costs:

319. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

320. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Equitable Relief:

321. Reinstatement of Plaintiff's professional reputation and opportunities to ensure she can continue her career without the lasting impact of Defendants' conduct.

322. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm inflicted by Defendants.

Any Other Relief:

323. Such other and further relief as this Court deems just and proper under the circumstances.

324. Plaintiff demands a trial by jury on all issues so triable.

## THIRD CAUSE OF ACTION

### Intentional Infliction Of Emotional Distress

325. Ms. Bengabsia incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

326. Defendants engaged in conduct that was extreme, outrageous, and intended to cause, or was performed with reckless disregard for the likelihood of causing, severe emotional distress to Plaintiff.

327. Defendant Alli's repeated acts of harassment, intimidation, and physical misconduct, combined with BlackRock's willful indifference, inflicted significant psychological harm on Plaintiff.

328. The conduct of Defendant Alli included egregious incidents such as the October 2, 2018, episode in which he intentionally humped Plaintiff's chair in a humiliating and public display of degradation, and the October 11, 2018, incident where he stood uncomfortably close to Plaintiff, made explicit verbal threats, and openly mocked the concept of harassment.

329. These actions, taken together, were so outrageous in character and extreme in degree that they exceeded all bounds of decency tolerated in a civilized society (see *Howell v. New York Post Co.*, 81 NY2d 115, 122 [1993], noting that conduct is actionable when it shocks the conscience).

330. The outrageousness of Defendant Alli's actions is further magnified by the context of Plaintiff's identity as a devout Muslim woman who wears a hijab. Defendant Alli's conduct not only violated societal norms, but also profoundly insulted and degraded Plaintiff's deeply held religious beliefs and cultural identity.

331. His actions, such as publicly humiliating Plaintiff with sexual gestures and verbal threats, were particularly egregious given Plaintiff's commitment to modesty and dignity as core principles of her faith. Courts have recognized that targeting an individual's religious identity in harassment claims compounds the severity of emotional distress (see *Doe v. Guthrie Clinic, Ltd.*, 22 NY3d 480, 484-485 [2014], acknowledging the heightened harm caused by conduct infringing on personal dignity).

332. BlackRock compounded Plaintiff's emotional distress by failing to take appropriate remedial action after being made aware of Defendant Alli's conduct. Plaintiff reported multiple instances of harassment to BlackRock's management and human resources department, yet her complaints were ignored or dismissed, emboldening Defendant Alli to continue his behavior unabated.

333. This lack of intervention by BlackRock reflects a deliberate indifference to the emotional harm caused to Plaintiff and a systemic failure to protect her from further abuse (see *Kennedy v. McKesson Co.*, 58 NY2d 500, 504-505 [1983], recognizing an employer's duty to act when workplace conditions cause foreseeable harm).

334. The emotional harm suffered by Plaintiff as a result of Defendants' actions is well-documented. Plaintiff has been diagnosed with post-traumatic stress disorder (PTSD), severe anxiety, and depression by medical professionals. These conditions were directly caused by the extreme and outrageous conduct of Defendant Alli and BlackRock's enabling of such behavior.

335. Plaintiff's symptoms include recurring panic attacks, sleeplessness, and a diminished ability to function professionally and personally (see *Freihofer v. Hearst Corp.,* 65 NY2d 135, 143 [1985], emphasizing the heightened culpability required for claims involving emotional distress).

336. Courts have long recognized that sustained harassment and abuse, especially in the workplace, can form the basis of a claim for intentional infliction of emotional distress. In *Murphy v. American Home Prods. Corp.*, 58 NY2d 293, 303 (1983), the court held that behavior demonstrating reckless disregard for an employee's well-being can substantiate such a claim. Additionally, targeting an individual based on personal identity aggravates the outrageousness of misconduct.

337. Defendants' conduct was intentional, malicious, and performed with reckless disregard for the consequences of their actions on Plaintiff.

338. Their behavior demonstrates a clear pattern of targeting Plaintiff for abuse, ignoring her pleas for help, and perpetuating an environment where harassment and intimidation were tolerated and normalized.

339. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

340. The defendant's conduct was wanton, malicious, willful, and/or cruel, entitling the plaintiff to punitive damages.

341. This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022) because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

Compensatory Damages:

342. For the severe emotional and psychological harm caused by Defendants' intentional misconduct, including the costs of ongoing medical and therapeutic treatment, as well as compensation for loss of quality of life and diminished career opportunities.

Punitive Damages:

343. To punish Defendants for their egregious and malicious actions and to deter others from engaging in similar conduct.

Declaratory and Injunctive Relief:

344. A declaration that Defendants' actions violated Plaintiff's rights under applicable laws.

345. An injunction requiring BlackRock to implement comprehensive anti-harassment and anti-discrimination training, establish independent oversight of harassment complaints, and adopt systemic reforms to create a safe and respectful workplace.

346. An order requiring Defendants to provide periodic reports to the Court detailing compliance with these measures over a five-year period.

Equitable Relief:

347. Reinstatement of Plaintiff's professional reputation and the implementation of measures to ensure Plaintiff's career prospects are not unfairly harmed by Defendants' actions.

348. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm caused by Defendants' conduct.

Attorneys' Fees and Costs:

349. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

350. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Any Other Relief:

351. Such other and further relief as this Court deems just and proper under the circumstances.

352. Plaintiff demands a trial by jury on all issues so triable.

**FOURTH CAUSE OF ACTION**
**Aiding and Abetting Unlawful Discrimination and Retaliation in Violation of the NYSHRL**
**(Against Corporate Defendant)**

353. Ms. Bengabsia incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

354. Defendants BlackRock Inc. and its employees aided and abetted unlawful discrimination, harassment, and retaliation against Plaintiff in violation of the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code §§ 8-107, et seq., and the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law §§ 290, et seq. The aiding and abetting provisions of both laws impose liability on individuals and entities who knowingly participate in, encourage, or fail to take reasonable steps to prevent acts of discrimination and retaliation.

Defendant Alli's Direct Conduct

355. Defendant Alli's repeated acts of harassment, as detailed throughout this complaint, were unlawful under both the NYCHRL and NYSHRL. His conduct included:

356. Physical Harassment: Humping Plaintiff's chair on October 2, 2018, was an egregious act of physical misconduct intended to humiliate and degrade Plaintiff in a professional setting.

357. Verbal Intimidation: Publicly questioning, "Should I do it? Should I touch her? Does it count as sexual harassment if I touch her?" on October 11, 2018, while standing uncomfortably close to Plaintiff, created an atmosphere of intimidation and hostility.

358. Mockery of Plaintiff's Identity: Defendant Alli and other colleagues frequently ridiculed Plaintiff's cultural and religious practices, exacerbating the hostile work environment.

///
///
///

BlackRock's Role in Aiding and Abetting

359. Under the NYCHRL and NYSHRL, employers can be held liable for aiding and abetting discrimination if they fail to act on known harassment or retaliation. Despite being made aware of Defendant Alli's actions through Plaintiff's repeated complaints, BlackRock failed to:

360. Investigate Complaints: Plaintiff reported Defendant Alli's behavior to human resources, management, and the diversity office on multiple occasions. BlackRock's failure to launch thorough investigations or provide meaningful responses enabled the continuation of the harassment.

361. Discipline Defendant Alli: BlackRock retained Defendant Alli in a supervisory position despite knowledge of his misconduct. This decision effectively endorsed his behavior and signaled to other employees that harassment and discrimination would be tolerated.

362. Prevent Retaliation: After Plaintiff reported Defendant Alli's actions, she was ostracized, assigned to work near him, and subjected to further intimidation. These retaliatory actions were facilitated by BlackRock's failure to implement safeguards against such behavior.

Legal Standard for Aiding and Abetting

363. The aiding and abetting provisions of both the NYCHRL (N.Y.C. Admin. Code § 8-107(6)) and NYSHRL (N.Y. Exec. Law § 296(6)) impose liability on individuals and entities who assist, encourage, or fail to prevent acts of discrimination or retaliation. Courts have interpreted these provisions broadly to hold employers and coworkers accountable for contributing to or ignoring unlawful behavior (see *Tomka v. Seiler Corp.,* 66 F3d 1295, 1317 [2d Cir. 1995], abrogated on other grounds).

364. Under these standards, BlackRock's inaction and complicity in Defendant Alli's misconduct meet the threshold for aiding and abetting liability. The company's systemic failures perpetuated a hostile work environment and enabled continued harassment and retaliation against Plaintiff.

Emotional and Professional Harm

365. BlackRock's aiding and abetting of unlawful conduct caused Plaintiff significant emotional distress, including post-traumatic stress disorder (PTSD), anxiety, and

depression, as documented by medical professionals. Plaintiff also suffered professional harm, including constructive discharge and damage to her career prospects.

Broader Organizational Failures

366. BlackRock's failure to enforce anti-harassment policies and protect employees from retaliation reflects systemic deficiencies that go beyond Plaintiff's case. By tolerating and enabling discriminatory conduct, BlackRock undermined its obligation to provide a safe and equitable workplace.

367. As a direct and proximate result of Defendant BlackRock unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic damages, mental anguish and emotional distress for which she is entitled to an award of damages and other relief to the greatest extent permitted by law, in addition to reasonable attorneys' fees and expenses.

368. Defendant BlackRock's unlawful actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

369. This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022) because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130").

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows

Compensatory Damages:

370. For the severe emotional and psychological harm caused by Defendants' conduct, including the costs of ongoing medical and therapeutic treatment, as well as compensation for loss of quality of life and diminished career opportunities.

Punitive Damages:

371. To punish Defendants for their egregious and malicious actions and to deter others from engaging in similar conduct.

Declaratory and Injunctive Relief:

372. A declaration that Defendants' actions violated Plaintiff's rights under the NYCHRL and NYSHRL.

373. An injunction requiring BlackRock to implement comprehensive anti-harassment and anti-discrimination training, establish independent oversight of harassment complaints, and adopt systemic reforms to create a safe and respectful workplace.

374. An order requiring Defendants to provide periodic reports to the Court detailing compliance with these measures over a five-year period.

Equitable Relief:

375. Reinstatement of Plaintiff's professional reputation and the implementation of measures to ensure Plaintiff's career prospects are not unfairly harmed by Defendants' actions.

376. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm caused by Defendants' conduct.

Attorneys' Fees and Costs:

377. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

378. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Any Other Relief:

379. Such other and further relief as this Court deems just and proper under the circumstances.

380. Plaintiff demands a trial by jury on all issues so triable.

## FIFTH CAUSE OF ACTION

**Negligence against BlackRock**

381. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

382. Defendant BlackRock, as Plaintiff's employer, owed Plaintiff a duty to exercise reasonable care in hiring, supervising, retaining, and managing its employees, and to provide a safe, secure, and non-discriminatory workplace. BlackRock breached this duty through negligent hiring, negligent retention, negligent supervision, and repeated failures to address the ongoing harassment and misconduct committed by Defendant Alli.

383. Upon information and belief, Defendant Alli had a history of inappropriate, abusive, or sexually harassing conduct toward female employees, or BlackRock would have discovered such a history had it exercised reasonable care in hiring, background investigation, or early supervision. BlackRock knew or reasonably should have known about Defendant Alli's propensity for misconduct and the foreseeable risk he posed to Plaintiff and other employees.

384. Plaintiff made multiple complaints to BlackRock's human resources department and senior management regarding Defendant Alli's behavior—including physical harassment, verbal intimidation, workplace hostility, religious harassment, and sexually humiliating conduct. Despite this actual knowledge and constructive knowledge,

BlackRock failed to take appropriate remedial action, failed to discipline Defendant Alli, and failed to implement meaningful measures to protect Plaintiff from further harm.

385. The negligent acts and omissions of BlackRock include, but are not limited to:

a. Failing to adequately investigate Plaintiff's multiple complaints of harassment, misconduct, and sexual intimidation.
b. Retaining Defendant Alli in his position despite knowledge of his repeated inappropriate and harmful behavior toward Plaintiff.
c. Failing to exercise reasonable care in hiring or retaining Alli despite knowledge or constructive knowledge of his propensity for sexual harassment and assault.
d. Failing to adequately supervise Alli and failing to discipline him for his sexual assault, harassment, and intimidation of Plaintiff.
e. Failing to enforce workplace policies designed to prevent harassment and protect employees from foreseeable harm.
f. Failing to provide adequate training to employees and management on recognizing and addressing workplace harassment, discrimination, and sexual misconduct; and
g. Creating, fostering, or permitting a workplace culture in which harassment, intimidation, misogyny, and retaliatory behavior were normalized, ignored, excused, or dismissed.

386. BlackRock's negligence—including negligent hiring, negligent retention, negligent supervision, and systemic failure to respond—was a substantial factor and proximate cause of Plaintiff's injuries. BlackRock's failure to monitor, discipline, or restrict Defendant Alli's conduct allowed him to continue abusing his authority, escalating his harassment of Plaintiff and worsening the harm she suffered.

387. As a direct and proximate result of BlackRock's negligence, Plaintiff suffered physical injury; severe emotional distress; anxiety; post-traumatic stress disorder (PTSD); depression; panic attacks; humiliation; embarrassment; loss of professional standing; diminished work performance; and related economic harm, as documented by medical professionals and consistent with her diagnosed psychological injuries.

388. Courts have consistently recognized employer liability for negligent hiring, retention, and supervision when an employer knows or should know of an employee's propensity for harmful misconduct (see Kennedy v. McKesson Co., 58 NY2d 500, 504–505 [1983]; Hall v. Smathers, 240 NY 486, 489 [1925]). The Court of Appeals further recognizes that systemic negligence by an employer can exacerbate individual misconduct and directly contribute to employee harm (see Doe v. Guthrie Clinic, Ltd., 22 NY3d 480, 484–485 [2014]).

389. BlackRock's failure to respond to Plaintiff's complaints, coupled with its retention of an employee with a known pattern of harmful behavior, created an unsafe and dangerous environment that directly contributed to Plaintiff's injuries. This systemic negligence fostered a workplace culture in which misconduct was tolerated and complaints were dismissed, causing severe emotional, psychological, and professional harm to Plaintiff.

390. This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j, because it arises out of conduct perpetrated against Plaintiff—who was eighteen years of age or older at the time—that constitutes one or more sexual offenses as defined in Article 130 of the New York Penal Law.

## Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

Compensatory Damages:

391. For the severe emotional and psychological harm caused by Defendants' negligence, including the costs of ongoing medical and therapeutic treatment, as well as compensation for loss of quality of life and diminished career opportunities.

Punitive Damages:

392. To punish Defendants for their egregious and malicious actions and to deter others from engaging in similar conduct.

Declaratory and Injunctive Relief:

393. A declaration that Defendants' actions violated Plaintiff's rights under applicable laws.

394. An injunction requiring BlackRock to implement comprehensive anti-harassment and anti-discrimination training, establish independent oversight of harassment complaints, and adopt systemic reforms to create a safe and respectful workplace.

395. An order requiring Defendants to provide periodic reports to the Court detailing compliance with these measures over a five-year period.

Equitable Relief:

396. Reinstatement of Plaintiff's professional reputation and the implementation of measures to ensure Plaintiff's career prospects are not unfairly harmed by Defendants' actions.

397. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm caused by Defendants' conduct.

Attorneys' Fees and Costs:

398. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

399. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Any Other Relief:

400. Such other and further relief as this Court deems just and proper under the circumstances.

401. Plaintiff demands a trial by jury on all issues so triable.

**SIXTH CAUSE OF ACTION**
**Violation of the Victims of Gender**
**Motivated Violence Act, N.Y.C. Admin. Code §§ 10- 1101, *et seq.* ("VGMVPL")**
**(Against Individual Defendant)**

402. Ms. Bengabsia incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

403. Defendant Alli's repeated acts of harassment and physical misconduct against Plaintiff constitute crimes of violence motivated by gender under the Victims of Gender-Motivated Violence Act (VGMVPL), N.Y.C. Admin. Code § 10-1101, et seq. These acts include but are not limited to the October 2, 2018, incident where Defendant Alli forcefully humped Plaintiff's chair in a public display of humiliation, and the October 11, 2018, incident where he verbally threatened to touch her while mocking the concept of harassment.

404. The facts show that Defendant Alli's behavior was part of a deliberate pattern of targeting Plaintiff. For example, in September 2018, Defendant Alli engaged in inappropriate conduct by repeatedly rolling a ball near Plaintiff's desk and insisting she bend over to pick it up. These actions were clearly intended to demean and objectify Plaintiff in front of her colleagues, further exacerbating the hostile work environment.

405. Additionally, during a workplace conversation in October 2018, Defendant Alli publicly questioned, "Should I do it? Should I touch her? Does it count as sexual harassment if I touch her?" His actions were encouraged by colleagues who laughed and goaded him on. This collective mockery and humiliation created a toxic environment, intensifying the harm to Plaintiff.

406. Under § 10-1103 of the VGMVPL, a "crime of violence motivated by gender" is defined as a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender. Defendant Alli's actions meet this standard because they were intentionally targeted at Plaintiff due to her gender and aimed at asserting power and control through demeaning, intimidating, and humiliating behavior. Defendant Alli's conduct was physically invasive, explicitly threatening, and accompanied by overt mockery, thereby satisfying the statutory requirement that the acts present a serious risk of physical harm.

Crime of Violence

407. Defendant Alli's acts of humping Plaintiff's chair, rolling a ball to compel her to bend over, and threatening to touch her constitute physical violations that meet the definition of crimes of violence. These actions go beyond mere offensive conduct and involve intentional physical invasions and explicit threats designed to degrade and humiliate Plaintiff.

408. Courts have affirmed that non-consensual physical acts and threats, when motivated by gender animus, qualify as crimes of violence under the VGMVPL (see *Breest v. Haggis*, 180 AD3d 83, 93 [1st Dept 2019]).

Motivated by Gender

409. Defendant Alli's actions were specifically targeted at Plaintiff because of her gender. His consistent harassment, including physical and verbal misconduct, was aimed at asserting dominance over Plaintiff in a professional setting, exploiting her gender as a tool for humiliation.

410. The animus is evident in the mocking and threatening language, combined with actions intended to demean Plaintiff as a woman in the workplace.

Animus Based on Gender

411. Defendant Alli's conduct, including mocking Plaintiff and threatening her in front of colleagues, demonstrates a clear animus rooted in gender. This animus was evident in his repeated and deliberate targeting of Plaintiff, reducing her to an object of ridicule and physical violation.

412. Animus based on gender emphasizes patterns of behavior that treat individuals as inferior or subordinate due to their gender.

BlackRock's Complicity and Systemic Negligence

413. BlackRock's failure to address Plaintiff's repeated complaints further supports liability under the VGMVPL. By ignoring reports of gender-motivated violence, BlackRock enabled and perpetuated a workplace culture where such conduct was tolerated and normalized.

414. Most significantly, BlackRock HR Vice President Khusbhat Chaudhry admitted in real-time text communications that BlackRock would "try to make it a performance case" against Plaintiff in retaliation for her harassment complaints (paragraphs 84-90). This

contemporaneous admission by Chaudhry—a senior HR executive with authority over investigation and personnel decisions—demonstrates that the adverse employment actions were undertaken with explicit intent to retaliate for Plaintiff's protected activity. The admission establishes that the retaliation was premeditated, predetermined, and part of institutional practice.

415. Plaintiff's documented complaints to human resources and senior management went unaddressed, creating an environment where Defendant Alli was emboldened to escalate his misconduct.

416. Employers have a duty to intervene when workplace conditions foreseeably lead to harm (see *Kennedy v. McKesson Co.*, 58 NY2d 500, 504-505 [1983], affirming the duty of care to prevent harm caused by known risks).

Emotional and Professional Harm

417. As a direct and proximate result of Defendant Alli's conduct and BlackRock's enabling of such behavior, Plaintiff suffered severe emotional distress, including post-traumatic stress disorder (PTSD), anxiety, and depression.

418. Plaintiff's injuries, documented by medical professionals, include recurring panic attacks, insomnia, and an inability to function effectively in her professional and personal life (see *Doe v. Guthrie Clinic, Ltd.*, 22 NY3d 480, 484-485 [2014], recognizing the emotional toll of systemic negligence).

419. Defendant Alli's acts and BlackRock's systemic negligence satisfy the statutory requirements of the VGMVPL, demonstrating intentional, gender-based violence that caused Plaintiff lasting emotional, professional, and psychological harm.

420. As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

421. The above-described conduct of Defendant Mr. Alli constitutes a sexual offense as defined in Article 130 of the New York Penal Law.

422. This cause of action is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j (McKinney 2022), because it arises out of conduct perpetrated against Plaintiff, who was eighteen years of age or older at the time of the conduct, which constitutes multiple sexual offenses as defined Article 130 of the New York Penal Law ("Article 130".

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

Compensatory Damages:

423. For the severe emotional and psychological harm caused by Defendants' conduct, including the costs of ongoing medical and therapeutic treatment, as well as compensation for loss of quality of life and diminished career opportunities.

Punitive Damages:

424. To punish Defendants for their egregious and malicious actions and to deter others from engaging in similar conduct.

Declaratory and Injunctive Relief:

425. A declaration that Defendants' actions violated Plaintiff's rights under the VGMVPL and other applicable laws.

426. An injunction requiring BlackRock to implement comprehensive anti-harassment and anti-discrimination training, establish independent oversight of harassment complaints, and adopt systemic reforms to create a safe and respectful workplace.

427. An order requiring Defendants to provide periodic reports to the Court detailing compliance with these measures over a five-year period.

Equitable Relief:

428. Reinstatement of Plaintiff's professional reputation and the implementation of measures to ensure Plaintiff's career prospects are not unfairly harmed by Defendants' actions.

429. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm caused by Defendants' conduct.

Attorneys' Fees and Costs:

430. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

431. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Any Other Relief:

432. Such other and further relief as this Court deems just and proper under the circumstances.

433. Plaintiff demands a trial by jury on all issues so triable.

**SEVENTH CAUSE OF ACTION**

**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL")**

434. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

435. Defendants discriminated against Plaintiff on the basis of her gender by subjecting her to severe and pervasive sexual harassment, creating a hostile work environment, and taking adverse employment actions against her in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq. Plaintiff, a Muslim woman working in a predominantly male environment, was repeatedly targeted for harassment, intimidation, and humiliation by Defendant Alli, while BlackRock failed to take prompt and effective remedial action despite having actual and constructive knowledge of his misconduct.

436. Defendant Alli engaged in a pattern of discriminatory and harassing conduct that included, but was not limited to:

a. Inappropriate Physical Contact: On October 2, 2018, Defendant Alli forcefully humped Plaintiff's chair in a workplace setting, an act intended to degrade and humiliate Plaintiff publicly.
b. Verbal Harassment: On October 11, 2018, Defendant Alli openly mocked the concept of sexual harassment, asking in front of colleagues, "Should I do it? Should I touch her? Does it count as sexual harassment if I touch her?" These statements were made to intimidate Plaintiff and trivialize her safety and dignity.
c. Dehumanizing Conduct: Beginning in September 2018, Defendant Alli repeatedly rolled a ball near Plaintiff's desk and insisted she bend over to retrieve it, behavior designed to objectify and demean her.
d. Group Encouragement: Defendant Alli's colleagues laughed at and encouraged his misconduct, fostering a culture of impunity and deepening Plaintiff's isolation.
e. Religious and Cultural Insensitivity: Defendant Alli also mocked Plaintiff's religious beliefs and cultural practices, compounding the gender-based hostility and further contributing to the hostile work environment.

437. These acts—combined with Defendant Alli's ongoing verbal and physical intimidation—created a hostile, abusive, and discriminatory working environment that interfered with Plaintiff's ability to perform her job and caused severe emotional distress. The NYSHRL expressly prohibits such discriminatory harassment under N.Y. Exec. Law § 296(1)(a).

BlackRock's Liability

438. BlackRock, as Plaintiff's employer, is liable under the NYSHRL for failing to prevent, investigate, or correct the harassment and discrimination faced by Plaintiff. Despite Plaintiff's repeated reports to human resources and senior management, BlackRock:

a. Failed to conduct a prompt, thorough, or good-faith investigation.
b. Failed to discipline Defendant Alli for his misconduct.
c. Failed to implement effective corrective or preventative measures.
d. Conducted a sham investigation designed to protect the male harasser rather than the female victim.
e. Retaliated against Plaintiff for complaining of discrimination by giving her a discriminatory and retaliatory low performance rating.
f. Constructively discharged Plaintiff; and
g. Promoted Defendant Alli—the male harasser—while pushing out Plaintiff, the female victim.

439. BlackRock's inaction, complicity, and retaliatory conduct enabled Defendant Alli's behavior to escalate, created a workplace culture where harassment was tolerated, and violated its statutory obligations to maintain a discrimination-free environment. Courts consistently hold employers liable for failing to act on known harassment (see *Matter of State Div. of Human Rights v. St. Elizabeth's Hosp*., 66 NY2d 684, 687 [1985]).

440. Additionally, BlackRock HR Vice President Khusbhat Chaudhry explicitly admitted in contemporaneous text messages that BlackRock's standard practice is to "make" a performance case against harassment complainants (paragraphs 84-90). This direct admission by BlackRock's own HR leadership proves that the discriminatory retaliation against Plaintiff was not an isolated incident but part of institutional policy to protect harassers and punish victims.

<u>Emotional and Professional Harm</u>

441. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, including PTSD, anxiety, depression, recurring panic attacks, insomnia, difficulty concentrating, and related psychological injuries documented by medical professionals. These conditions impaired her ability to function both professionally and personally (see *Forrest v. Jewish Guild for the Blind*, 3 NY3d 295, 310–311 [2004]).]

<u>Systemic Failures</u>

442. BlackRock's systemic failure to respond to Plaintiff's complaints violated its duties under the NYSHRL and fostered a culture that tolerated and perpetuated gender-based harassment and discrimination (see *Zakrzewska v. New School*, 14 NY3d 469, 479–480 [2010]).

443. The discrimination was a substantial motivating factor in the adverse employment actions BlackRock took against Plaintiff—including its sham investigation, retaliatory low

performance rating, and constructive discharge. BlackRock has not proven by clear and convincing evidence that it would have taken the same actions absent its discriminatory motive.

444. Defendants' unlawful and discriminatory actions were intentional, malicious, and done with deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL, entitling Plaintiff to punitive damages.

Timeliness

445. This action is timely under CPLR § 214-j because it alleges intentional and negligent acts causing physical, psychological, and other injuries resulting from conduct that would constitute sexual offenses under Article 130 of the New York Penal Law, committed against Plaintiff when she was over eighteen years old.

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

Compensatory Damages:

446. For the severe emotional and psychological harm caused by Defendants' conduct, including the costs of ongoing medical and therapeutic treatment, as well as compensation for loss of quality of life and diminished career opportunities.

Punitive Damages:

447. To punish Defendants for their egregious and malicious actions and to deter others from engaging in similar conduct.

Declaratory and Injunctive Relief:

448. A declaration that Defendants' actions violated Plaintiff's rights under the NYSHRL and other applicable laws.

449. An injunction requiring BlackRock to implement comprehensive anti-harassment and anti-discrimination training, establish independent oversight of harassment complaints, and adopt systemic reforms to create a safe and respectful workplace.

450. An order requiring Defendants to provide periodic reports to the Court detailing compliance with these measures over a five-year period.

Equitable Relief:

451. Reinstatement of Plaintiff's professional reputation and the implementation of measures to ensure Plaintiff's career prospects are not unfairly harmed by Defendants' actions.

452. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm caused by Defendants' conduct.

Attorneys' Fees and Costs:

453. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

454. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Any Other Relief:

455. Such other and further relief as this Court deems just and proper under the circumstances.

456. Plaintiff demands a trial by jury on all issues so triable.

## EIGHT CAUSE OF ACTION

**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL") (Against Individual Defendant)**

457. Ms. Bengabsia incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

458. Defendants discriminated against Plaintiff on the basis of her gender by subjecting her to severe and pervasive sexual harassment and creating a hostile work environment in violation of the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code §§ 8-101, et seq. The NYCHRL provides broader protections than its state and federal counterparts, requiring only that harassment create an unequal workplace environment due to gender, without needing to reach the "severe or pervasive" standard (see *Williams v. New York City Housing Authority*, 61 AD3d 62, 74-75 [1st Dept 2009]).

Defendant Alli's Discriminatory Conduct

459. Defendant Alli engaged in a sustained pattern of harassment and discriminatory behavior, including but not limited to:

a. *Physical Harassment*: On October 2, 2018, Defendant Alli forcefully humped Plaintiff's chair, a public act designed to humiliate and degrade her in the workplace. This overtly physical invasion of Plaintiff's personal space underscored his intent to demean her as a woman.

b. *Verbal Intimidation*: On October 11, 2018, Defendant Alli publicly mocked the concept of sexual harassment, stating, "Should I do it? Should I touch her? Does it count as sexual harassment if I touch her?" These comments, made in the presence of colleagues, were intended to intimidate Plaintiff and highlight her vulnerability in a hostile workplace.

c. *Dehumanizing Actions*: Beginning in September 2018, Defendant Alli repeatedly rolled a ball near Plaintiff's desk and demanded that she bend over to retrieve it. These actions were calculated to objectify and humiliate Plaintiff, amplifying her discomfort in the workplace.

d. *Mockery of Plaintiff's Identity*: Coupled with Defendant Alli's conduct, Plaintiff's colleagues mocked Plaintiff's religious and cultural practices. For example, after overhearing Plaintiff greet her family with "As-salamu alaykum" on a phone call, a workplace discussion ensued where Plaintiff's cultural identity became a source of ridicule, further exacerbating the hostile work environment.

e. *Public Humiliation at Work Functions*: During a holiday party in December 2018, Plaintiff was berated by colleagues for not participating in holiday traditions, despite her explanation that her religious beliefs did not align with such celebrations. Defendant Alli and others used this opportunity to single her out, further alienating her from her peers.

BlackRock's Negligence under NYCHRL

460. Under the NYCHRL, employers are strictly liable for the actions of supervisors, such as Defendant Alli, who engage in discriminatory conduct (see *Zakrzewska v. New School*, 14 NY3d 469, 479-480 [2010]). Despite being made aware of Defendant Alli's behavior through Plaintiff's repeated complaints to human resources and senior management, BlackRock failed to:

a. Investigate or address Plaintiff's allegations in a timely and effective manner.
b. Discipline Defendant Alli for his misconduct.
c. Implement meaningful measures to prevent further harassment and discrimination.

461. BlackRock's inaction and failure to remediate the situation enabled a workplace culture that tolerated and normalized harassment and discrimination. Under the NYCHRL, this failure constitutes a violation of N.Y.C. Admin. Code § 8-107(1)(a), which prohibits discrimination and harassment in employment based on gender and other protected characteristics.

Emotional and Professional Harm

462. The hostile work environment caused Plaintiff significant emotional distress, including post-traumatic stress disorder (PTSD), anxiety, and depression, as documented by her medical providers.

463. Plaintiff experienced recurring panic attacks, insomnia, and difficulty concentrating, all of which impaired her ability to perform professionally and maintain her well-being. BlackRock's failure to provide a safe and equitable workplace directly contributed to these injuries (see *Forrest v. Jewish Guild for the Blind*, 3 NY3d 295, 310-311 [2004], recognizing employer liability for workplace conditions causing harm).

Broader Scope of NYCHRL Protections

464. The NYCHRL mandates that courts and employers construe its provisions liberally to ensure maximum protection for employees. Unlike the state or federal standards, the NYCHRL requires only that Plaintiff demonstrate that she was treated less well than other

employees due to her gender, without needing to show the conduct was "severe or pervasive" (see *Williams*, 61 AD3d at 78).

465. By targeting Plaintiff with repeated harassment and failing to act on her complaints, Defendants violated the NYCHRL's mandate to provide a discrimination-free workplace, warranting compensatory and punitive damages.

466. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

467. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

468. This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section. The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Plaintiff when she was over eighteen years of age.

**Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

<u>Compensatory Damages</u>:

469. For the severe emotional and psychological harm caused by Defendants' conduct, including the costs of ongoing medical and therapeutic treatment, as well as compensation for loss of quality of life and diminished career opportunities.

<u>Punitive Damages</u>:

470. To punish Defendants for their egregious and malicious actions and to deter others from engaging in similar conduct.

<u>Declaratory and Injunctive Relief</u>:

471. A declaration that Defendants' actions violated Plaintiff's rights under the NYCHRL and other applicable laws.

472. An injunction requiring BlackRock to implement comprehensive anti-harassment and anti-discrimination training, establish independent oversight of harassment complaints, and adopt systemic reforms to create a safe and respectful workplace.

473. An order requiring Defendants to provide periodic reports to the Court detailing compliance with these measures over a five-year period.

<u>Equitable Relief</u>:

474. Reinstatement of Plaintiff's professional reputation and the implementation of measures to ensure Plaintiff's career prospects are not unfairly harmed by Defendants' actions.

475. Funding for Plaintiff's ongoing therapeutic and medical care necessitated by the emotional and psychological harm caused by Defendants' conduct.

Attorneys' Fees and Costs:

476. An award of reasonable attorneys' fees, expert witness fees, and costs incurred in this action, as permitted by applicable laws.

Pre- and Post-Judgment Interest:

477. An award of pre- and post-judgment interest on all monetary damages awarded to Plaintiff as permitted by law.

Any Other Relief:

478. Such other and further relief as this Court deems just and proper under the circumstances.

479. Plaintiff demands a trial by jury on all issues so triable.

## II. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

a. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the State of New York.
b. An award of damages against Defendant, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment.
c. An award of damages against Defendant, in an amount to be determined at Trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress.
d. An award of punitive damages, in an amount to be determined at Trial.
e. Prejudgment interest on all amounts due.
f. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law;
g. **HR VP Khusbhat Chaudhry's explicit admission that BlackRock would fabricate a performance case to retaliate against harassment complainants**, demonstrating willfulness and consciousness of guilt:
    i. Pattern and practice affecting multiple employees ("that has happened to a lot of folks").
    ii. Threats by senior female executive that BlackRock could "ruin Plaintiff's career,"and,
h. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Date: November 20, 2025,

Respectfully submitted,

*/s/Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
tblackburn@tablackburnlaw.com

**PRESERVATION NOTICE**

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter. If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:
In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any such electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or

reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:
In terms of the paper information, you are directed to preserve any emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents pertaining to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery on this case arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this Complaint's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Date: November 20, 2025,

Respectfully submitted,

*/s/Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
tblackburn@tablackburnlaw.com

**DEMAND FOR INSURANCE COVERAGE**

Defendants are demanded to provide a complete copy of their applicable insurance policies and declaration sheets demonstrating coverage within thirty (30) days of service of this Complaint.

Date: November 20, 2025,

Respectfully submitted,

*/s/Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC.
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
tblackburn@tablackburnlaw.com